**Ralph J. ZOLA, Paul A. Zola, and Irving Zola d/b/a Biscayne Associates, Plaintiffs,**

v.

**Larry GORDON and Edward Wagner, Defendants.**

**No. 86 Civ. 4790 (KC).**

United States District Court, S.D. New York.

April 25, 1988.

Supplemental Opinion and Order May 4, 1988.

---

**358**

Lawrence A. Procari, Jr., Ralph Zola, Zola and Zola, New York City, for plaintiffs.

Neal Schwarzfeld, Schwarzfeld, Ganfer and Shore, New York City, for Larry Gordon.

Robert Frey, Deutsch and Frey, New York City, for Edward Wagner.

## OPINION AND ORDER

CONBOY, District Judge:

This case arises out of a failed tax shelter. In substance, plaintiffs claim, *inter alia,* that a movie in which they invested, given an assessed valuation by the IRS of $60,000.00, had been represented by the defendants as being worth $3.15 million. Plaintiffs seek to recover damages for violations of the federal securities laws, civil RICO, and state common law. Defendants, already convicted of criminal wrongdoing in connection with the marketing of movie tax shelter investments, including the limited partnership plaintiffs invested in, assert, *inter alia,* that the statutes of limitations have lapsed on various claims, and that liability under RICO has not been pleaded properly. Accordingly, interesting time bar, equitable estoppel, choice of law, and pleading questions are presented for resolution.

At an undetermined time prior to August, 1975, plaintiffs formed a partnership called Biscayne Associates ("Biscayne") to make investments. In September, 1975, the partnership paid $180,000 to acquire an interest of approximately twenty percent in Arlington Properties ("Arlington"), a limited partnership formed to invest in a movie entitled "The Romantic Englishwoman." It is undisputed that one of the main reasons Biscayne made its investment was the possibility of obtaining large tax write-offs. The limited partners believed they would receive tax losses over the amount invested. From 1975 to 1979, the plaintiffs took federal income tax deductions for their shares of Biscayne's partnership losses on the Arlington investment.

In 1979 the IRS began to audit the individual plaintiffs' tax returns. Plaintiff Ralph Zola knew, by 1980 at the latest, that the IRS was investigating Arlington, and challenging the partnership's cost evaluation of the movie of $3,150,000.00. In 1983, the IRS decided that the actual value of the movie was $60,000.00. The depreciation expense (or investment tax credit deductions) taken by Arlington and passed on to the limited partners, was disallowed.[1]

Plaintiffs first received notice of the position of the IRS with respect to the actual value of the movie in June 1984. At that time, Myron Weinberg, an attorney whose firm then was providing tax representation to defendant Gordon and Arlington, mailed to Ralph Zola a copy of a report prepared by an IRS agent for Arlington's partnership years 1975–79. *See* Affidavit of Myron Weinberg, executed April 24, 1987, at paras. 2–3 & Exhibit A. The report states that the movie had been screened and valued by three independent outside experts, and that the average value assigned was $60,000.00. The report concludes that the partnership's assigned value of $3,154,000.00[2] "is highly inflated," and that all

---

1. Both Ralph Zola and his wife Penni, and Paul Zola and his wife Judith, petitioned the IRS for redeterminations of tax deficiencies. In their petitions, both couples stated that the IRS had disallowed their claimed share of losses from Arlington Properties, which amounted to a total of $233,630.00 for each partner from 1975 to 1979. *See* Neal Schwarzfeld July 14, 1987 Aff. Exhibit G at para. 4(a) (Ralph and Penni Zola);

*id.* Exhibit H at para. 4(a) (Paul and Judith Zola).

2. The offering memorandum states that the value of the movie is $3,150,000.00. *See* Neal Schwarzfeld July 14, 1987 Aff. Exhibit B at 5. There is no explanation for the additional $4,000.00 in the IRS figure. This discrepancy is *de minimis.*

tax losses claimed by the partnership "are ... disallowed." *See* Weinberg Aff. Exhibit A.

Plaintiffs filed this action in June, 1986. The amended complaint alleges that Gordon made misrepresentations concerning the cost of the movie, and converted assets owned by Arlington to his own personal use and benefit. The amended complaint also alleges that Gordon violated his fiduciary duty to the plaintiffs by producing false and fraudulent partnership documents and income tax return forms, violated the federal securities laws, and violated the provisions of civil RICO. Jurisdiction is predicated on the existence of a federal question, 28 U.S.C. § 1331 (1982), and on the doctrine of pendent jurisdiction.

The action is before the court on various motions made by the two defendants. First, Gordon moves to dismiss the amended complaint under Fed.R.Civ.P. 9(b) and 12(b)(6), or in the alternative for summary judgment under Fed.R.Civ.P. 56(b). Second, Gordon seeks a protective order, pursuant to Fed.R.Civ.P. 26(c), precluding the discovery of certain personal financial records. Third, Gordon moves, pursuant to 28 U.S.C. § 636(b)(1)(A), for review of an order issued by Magistrate Nina Gershon granting plaintiffs' motion to compel discovery from Wendy Camarda, Gordon's daughter. Wagner moves for dismissal of the amended complaint on two grounds.

First, Wagner objects that he was not served with the complaint within one hundred twenty days after its filing, as required by Fed.R.Civ.P. 4(j). Second, he moves to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim for relief. Wagner also seeks the imposition of sanctions against the plaintiffs pursuant to Rule 11.

### LEGAL ANALYSIS

A. Gordon's motion to dismiss or for summary judgment

1. *Plaintiffs' claims under the federal securities laws*

The plaintiffs allege in count five of the amended complaint that the defendants are liable for violations of various sections of the federal securities laws.[3] Gordon does not raise the issue whether the limited partnership interests sold in Arlington are securities within the meaning of the Securities Act of 1933 ("the '33 Act") or the Securities Exchange Act of 1934 ("the '34 Act"). Instead, Gordon argues that the statutes of limitations governing these claims have lapsed.

Sections 11 and 12[4]

Section 11 subjects the issuer of registered[5] securities, and others, to liability for damages when the registration statement is materially false or misleading. Section 12(1) creates liability for the offer-

---

**3.** The amended complaint alleges liability under sections 5(a) and (c), 15 U.S.C. § 77e(a), (c) (1982), section 11, 15 U.S.C. § 77k (1982), and section 17(a), 15 U.S.C. § 77q(a) (1982), of the Securities Act of 1933. Liability also is alleged under section 10(b), 15 U.S.C. § 78j(b) (1982), of the Securities Exchange Act of 1934, and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1987), promulgated thereunder, and, lastly, section 20(a), 15 U.S.C. § 78t(a) (1982), of the Securities Exchange Act.

**4.** Section 5 of the '33 Act does not itself provide for a private right of action. *Unicorn Field, Inc. v. Cannon Group,* 60 F.R.D. 217, 223 (S.D.N.Y. 1973); *accord Russo v. Bache Halsey Stuart Shields, Inc.,* 554 F.Supp. 613, 621 (N.D.Ill.1982). "Private civil liability for violations of section 5 exists only when the provisions of section 12 have been met." *Russo,* 554 F.Supp. at 621; *see Greater Iowa Corp. v. McLendon,* 378 F.2d 783, 790 (8th Cir.1967), *quoted in Unicorn Field, Inc.,*

60 F.R.D. at 223. The provisions of section 12 have been met here, as plaintiffs allege a sale in violation of section 5, satisfying section 12(1), 15 U.S.C. § 77*l*(1) (1982), and a sale by means of a false or misleading prospectus, satisfying section 12(2), 15 U.S.C. § 77*l*(2) (1982). *See* Amended Complaint at paras. 7, 10–13, 15, 17. For that reason, the court scrutinizes the complaint as if plaintiffs had pleaded violations of sections 12(1) and (2).

**5.** The amended complaint lacks any allegation that Arlington was registered. In fact, the offering memorandum states on its first page, in block print, that "THE LIMITED PARTNERSHIP INTEREST [sic] DESCRIBED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933." *See* Schwarzfeld July 14, 1987 Aff. at Exhibit B. Nevertheless, the court will assume that section 11 is applicable, and proceed to address the statute of limitations question.

ing or sale of a security in violation of the registration or prospectus provisions of section 5. Section 12(2) creates liability for the offering or sale of a security, whether registered, not registered, or exempt from registration, by means of false or misleading statements made orally or contained in a prospectus. *See* L. Loss, Fundamentals of Securities Regulation 1016 (1983). Both sections are subject to a statutory time bar, contained in section 13 of the '33 Act, 15 U.S.C. § 77m (1982).

■ The court has a basis in law to dismiss plaintiffs' claims under these sections of the '33 Act, because plaintiffs have failed affirmatively to plead compliance with the statute of limitations contained in section 13, as they are required to do. *See Beres v. Thomson McKinnon Sec., Inc.,* [1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) para. 93,395 at 97,069 (S.D.N.Y.1987) [available on WESTLAW, 1987 WL 16977] (there "is a general congruence of opinion" that in circumstances such as these the plaintiffs have the burden of pleading facts showing they come within the statute of limitations); *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 525 (S.D. N.Y.1977) ("When Congress creates a new right of action by statute and in that same statute expressly limits the time in which a suit to enforce it may be brought, compliance with the period of limitations must be affirmatively pleaded before a suit to recover on the right of action may be instituted."); *Brick v. Dominion Mortgage & Realty Trust,* 442 F.Supp. 283, 291–92 (W.D. N.Y.1977) (compliance with section 13 "is an essential substantive ingredient of a private cause of action" based on the sections it relates to); *accord Adair v. Hunt Int'l Resources Corp.,* 526 F.Supp. 736, 748–49 (N.D.Ill.1981). This notwithstanding, the court elects to proceed to consider whether summary judgment is appropriate as to these claims.

■ Section 13 provides that ordinarily an action under section 11 or section 12(2) must be brought within one year after the actual or constructive discovery of the false or misleading statement. *See* 15 U.S.C. § 77m (1982). An action under sec-

tion 12(1) normally must be brought within one year after the violation on which it is based occurs. *Id.* The section further provides that "[i]n no event shall any ... action be brought to enforce a liability created under section 77k [section 11] or 77l(1) [section 12(1)] of this title more than three years after the security was bona fide offered to the public." *Id.* The majority of courts have held "that the three-year period begins to run from the date the security is *first* offered to the public." *Waterman v. Alta Verde Indus.,* 643 F.Supp. 797, 808 (E.D.N.C.1986) (emphasis in original); *accord Fischer v. International Tel. & Tel. Corp.,* 391 F.Supp. 744, 747 (E.D.N.Y.1975). This period is an absolute outer limitation. *Bresson v. Thomson McKinnon Sec., Inc.,* 641 F.Supp. 338, 343 (S.D.N.Y.1986) (section 11); *Clute v. Davenport Co.,* 584 F.Supp. 1562, 1576–77 (D.Conn.1984) (section 12(1)); *accord Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1308 (9th Cir.1982) (section 11); *Summer v. Land & Leisure, Inc.,* 664 F.2d 965, 968 (5th Cir. Unit B Dec. 1981) (section 11), *cert. denied,* 458 U.S. 1106, 102 S.Ct. 3484, 73 L.Ed.2d 1367 (1982). Construing the complaint liberally in plaintiffs' favor, it would appear the latest date shares in Arlington first could have been offered to the public is August, 1975. Thus, the statute of limitations on these claims lapsed at the latest in August, 1978. As this action was not filed until 1986, the claims under sections 11 and 12(1) of the '33 Act appear to be time-barred.

Section 13 states that, for actions based on section 12(2), "[i]n no event shall any ... action be brought to enforce a liability created ... under section 77l(2) [section 12(2)] of this title more than three years after the sale." 15 U.S.C. § 77m (1982). Again, this bar is absolute. *Bresson,* 641 F.Supp. at 343; *Brick,* 442 F.Supp. at 291. Plaintiffs admit that they purchased their share in Arlington in September, 1975. Thus, the allowable period for filing this claim would appear to have lapsed at the latest in September, 1978.

■ The plaintiffs argue, however, that the principle of equitable estoppel, as

opposed to the doctrine of equitable tolling,[6] applies to prevent the defendants from asserting the defense of the statutes of limitations on all of their federal claims, including these securities claims.[7] Equitable estoppel is a doctrine based on the principle that a wrongdoer may not take advantage of his own wrong. *See Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232–33, 79 S.Ct. 760, 761–62, 3 L.Ed.2d 770 (1959), *quoted in General Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125, 127–28, 219 N.E. 2d 169, 170–71, 272 N.Y.S.2d 337, 339 (1966). This doctrine applies even to statutes of limitations containing unequivocal language of termination. *See Glus*, 359 U.S. at 232–34, 79 S.Ct. at 761–763; *Bomba v. W.L. Belvidere, Inc.*, 579 F.2d 1067, 1069–70 (7th Cir.1978). Thus, the plaintiffs argue that the defendants cannot seek refuge behind section 13's absolute limitations period if they properly may invoke the doctrine.

A review of the cases shows that, with one exception, the assertion of fraudulent concealment has only permitted a

6. In *Bomba v. W.L. Belvidere, Inc.*, 579 F.2d 1067 (7th Cir.1978), the court explained that "[equitable] [t]olling, strictly speaking, is concerned with the point at which the limitations period begins to run and with the circumstances in which the running of the limitations period may be suspended." 579 F.2d at 1070. Equitable tolling may apply "though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party." *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 348, 22 L.Ed. 636 (1875), *quoted in Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946). In contrast, equitable estoppel

is not concerned with the running and suspension of the limitations period, but rather comes into play only after the limitations period has run and addresses itself to the circumstances in which a party will be estopped from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forebearing suit within the applicable limitations period. Its application is wholly independent of the limitations period and takes its life, not from the language of the statute, but from the equitable principle that no man will be permitted to profit from his own wrongdoing in a court of justice.

*Bomba*, 579 F.2d at 1070. The court applied equitable estoppel principles because other courts had held that equitable tolling principles did not apply to the statute of limitations of the statute in question. *Id.* at 1069–71.

7. The courts have held that the doctrine of equitable tolling does not apply to section 13's three-year limitation. *See, e.g., Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1308 (9th Cir.1982); *Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 968 (5th Cir. Unit B Dec. 1981), *cert. denied*, 458 U.S. 1106, 102 S.Ct. 3484, 73 L.Ed.2d 1367 (1982); *Turner v. First Wis. Mortgage Trust*, 454 F.Supp. 899, 911 (E.D.Wis.1978); *Brick v. Dominion Mortgage & Realty Trust*, 442 F.Supp. 283, 289–91 (W.D.N.Y.1977); *Cowsar v. Regional Recreations, Inc.*, 65 F.R.D. 394, 396–97 (M.D.La. 1974). Some of these cases have stated that *In re Home–Stake Production Company Securities*

*Litigation*, 76 F.R.D. 337 (N.D.Okla.1975), reaches a contrary result. *See Admiralty Fund*, 677 F.2d at 1308. In reality, the court in *Home–Stake* used equitable estoppel against the defendants. *See* 76 F.R.D. at 342, 344–45.

True equitable tolling does not depend on fraudulent concealment. *See supra* footnote 6. In *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946), the Court stated that equitable tolling "is read into every federal statute of limitation." 327 U.S. at 397, 66 S.Ct. at 585. Similarly, in *Exploration Co. v. United States*, 247 U.S. 435, 38 S.Ct. 571, 62 L.Ed. 1200 (1918), the Court applied the doctrine of *Bailey v. Glover*, stating that it could not "believe that Congress intended to give immunity to those who for the period named in the statute might be able to conceal their fraudulent action." *Id.* at 449, 38 S.Ct. at 574.

With section 13, however, there is a clear expression of congressional intent that tolling not apply. When Congress debated the '34 Act, it amended section 13, reducing its time periods, to conform to similar provisions in the '34 Act. 78 Cong.Rec. 8197–8203 (1934). Senator Norris strenuously objected to the retention of a "discovery" limitations period separate from a regular limitations period. *Id.* at 8198–8202. In response, Senator Fletcher stated that

the thought was that a man ought not to delay suit more than 1 year after he discovers the fraud. If he has been injured and finds that he has been injured, he ought to bring his action within a reasonable time, and we fix that time at 1 year. If he has not discovered it, the person who made the misrepresentation or false statement ought to feel safe at some reasonable time that he will not be disturbed.

*Id.* at 8198. Congress was concerned that a longer statute of limitations might "deter men from serving on boards of directors." *Id.* at 8200. Congress amended section 13, knowing that "[t]he lapse of the [outer statutory period] bars [a plaintiff] from bringing suit at all where he has made the discovery [of fraud and damages]." *Id.* at 8198 (remarks of Sen. Barkley). Congressional intent is clear, and must be respected.

plaintiff to bring claims within section 13's three-year outer limitation, not to extend the period beyond that time. *See, e.g., Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d at 1308; *Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1050, 1054–55 (2d Cir. 1969);[8] *Richey v. Westinghouse Credit Corp.,* 667 F.Supp. 752, 754–55 (W.D. Okla. 1986); *Clute,* 584 F.Supp. at 1576–77; *Kilmartin v. H.C. Wainwright & Co.,* 580 F.Supp. 604, 606–07 (D.Mass.1984); *Houlihan v. Anderson–Stokes, Inc.,* 434 F.Supp. 1319, 1322–23 (D.D.C.1977). The lone exception, permitting the estoppel to continue beyond section 13's three-year outer limit, is *In re Home–Stake Production Company Securities Litigation,* 76 F.R.D. 337 (N.D.Okla.1975). That court rejected the defense of the statute of limitations "in the interests of substantial justice by reason of the extraordinary facts and circumstances alleged by plaintiffs," including the settlement of an action, prior to class certification, based on the same conduct, and the signing of a SEC consent decree "conced[ing] technical violations of the securities laws." The court found that these actions were undertaken to permit the defendants to continue in their fraud. *See* 76 F.R.D. at 342, 344. The court sustained plaintiffs' claim of fraudulent concealment in light of "the alleged extensive and continuous fraud perpetrated upon Home–Stake investors, the SEC and the Courts for more than a decade." *Id.* at 345.

The plaintiffs here offer no facts remotely similar to those in *Home–Stake.* In fact, they do not allege any responsive, affirmative concealment by Gordon. *See Robertson v. Seidman & Seidman,* 609 F.2d 583, 593 (2d Cir.1979) (defendant allegedly altered its accounting work papers and destroyed documentary evidence to conceal its fraudulent conduct). Essentially, plaintiffs rely on the fiduciary duty Gordon owed them as a general partner to the limited partnership. *See* discussion *infra* at 364–365. This simply cannot suffice to bring the doctrine into play beyond section 13's three-year limitation, for it would contravene congressional intent. *See supra* footnote 7. Like partners, corporate directors owe their shareholders a fiduciary duty. This principle predates the '33 and '34 Acts. *See, e.g., Koehler v. Black River Falls Iron Co.,* 67 U.S. (2 Black) 715, 720–21, 17 L.Ed. 339 (1862). The court must presume Congress was aware of this principle when it passed and later amended section 13. *Cf. Glus v. Brooklyn E. Dist. Terminal,* 359 U.S. at 234, 79 S.Ct. at 762 (incorporating equitable estoppel principle into a federal statute because the defendant could not show anything "in the language or history of the [statute] to indicate that this principle of law, older than the country itself, was not to apply in suits arising under that statute").

The court concludes that the plaintiffs are not entitled to an estoppel beyond section 13's three-year absolute limitations period. On the undisputed facts, the latest time that their claims under sections 11 and 12 arose would have been in 1975. As the complaint in this action was not filed until 1986, these claims are time-barred.

Summary judgment for defendants is appropriate when the statute of limitations bars prosecution of an action. *See Stull v. Bayard,* 561 F.2d 429, 431 (2d Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978); *Arneil v. Ramsey,* 550

---

**8.** Persuasive authority exists for the proposition that section 12(1)'s one-year limitations period is an absolute one, because (1) section 13 does not contain a "discovery" rule for section 12(1) claims, as it does for section 12(2) claims, *see Stone v. Fossil Oil & Gas,* 657 F.Supp. 1449, 1457 (D.N.M.1987); 15 U.S.C. § 77m (1982); *see also Cook v. Avien, Inc.,* 573 F.2d 685, 691–92 (1st Cir.1978) (following "the explicit language of § 13"), and (2) application of the discovery rule is not justified as to section 12(1) claims, which are not fraud-based, and cannot be concealed effectively. *See Stone,* 657 F.Supp. at 1457 (quoting *McCullough v. Leede Oil & Gas, Inc.,*

617 F.Supp. 384, 387 (W.D.Okla.1985)); *see also* H. Bloomenthal, Securities Law Handbook § 11.09 at 300–01 (1986) (doctrine of equitable tolling not applicable to section 12(1) claims; "it takes only a telephone call to the public reference room of the [SEC] or one of its regional offices to determine whether or not a specific issuer has filed a registration statement"). Nevertheless, the law of the Second Circuit is that section 12(1) claims are subject to estoppel. *See Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1055 (2d Cir.1969); *In re Gas Reclamation, Inc. Sec. Litig.,* 659 F.Supp. 493, 507 (S.D.N.Y.1987).

F.2d 774, 778, 783 (2d Cir.1977). Summary judgment is granted to defendant Gordon on these claims.

### Section 10(b)

There is no statute of limitations contained within the '34 Act. When a federal statute does not contain any statute of limitations, federal courts must look to the law of the forum state. *See UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 703–04, 86 S.Ct. 1107, 1112–13, 16 L.Ed.2d 192 (1966); *Arneil v. Ramsey*, 550 F.2d 774, 779 (2d Cir.1977); *Appel v. Kidder, Peabody & Co.*, 628 F.Supp. 153, 155 (S.D.N.Y. 1986). For a federal court located in New York, reference must include New York's borrowing statute. *Arneil v. Ramsey*, 550 F.2d at 779; *Appel*, 628 F.Supp. at 155. New York Civil Practice Law & Rules ("CPLR") section 202 provides:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

N.Y. CPLR § 202 (McKinney 1972).

■ For purposes of the borrowing statute, plaintiffs' cause of action accrued where they sustained their loss. *Stafford v. International Harvester Co.*, 668 F.2d 142, 149–50 (2d Cir.1981); *Industrial Consultants, Inc. v. H.S. Equities, Inc.*, 646 F.2d 746, 747 (2d Cir.), *cert. denied*, 454 U.S. 838, 102 S.Ct. 145, 70 L.Ed.2d 120 (1981); *Appel*, 628 F.Supp. at 156. Economic loss usually is sustained at the plaintiff's place of residence. *Industrial Consultants Inc.*, 646 F.2d at 747; *Sack v. Low*, 478 F.2d 360, 368 (2d Cir.1973); *Appel*, 628 F.Supp. at 156.

Plaintiffs Ralph Zola and Paul Zola are residents of New Jersey. *See* Amended Complaint at paras. 1–2. Under New Jersey law, actions for fraud must be commenced "within 6 years next after the cause of any such action shall have accrued." N.J. Stat. Ann. § 2A:14–1 (West 1987).[9] A cause of action in fraud accrues on actual or constructive discovery of the fraud. *See Lopez v. Swyer*, 62 N.J. 267, 275, 300 A.2d 563, 567 n. 2 (1973); *Dreier Co. v. Unitronix Corp.*, 218 N.J. Super. 260, 273, 527 A.2d 875, 883 (App.Div.1986).

■ The applicable New York state statute of limitations is that prescribed for fraud. *Mittendorf v. J.R. Williston & Beane Inc.*, 372 F.Supp. 821, 830 (S.D.N.Y. 1974). The New York statute of limitations "most closely analogous to th[e] federal rule," *Stull v. Bayard*, 561 F.2d 429, 432 (2d Cir.1977), is N.Y. CPLR § 203(f).[10] That section provides a two year period. N.Y. CPLR 203(f) (McKinney Supp.1988).[11]

■ Although state law controls the limitations period, the date the statute begins to run is determined by federal common law. *See Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90

---

**9.** The New Jersey Uniform Securities Law, N.J. Stat.Ann. §§ 49:3–47 to :3–76 (West 1970 & Supp.1987), contains a general anti-fraud provision "virtually identical to section 101 of the Uniform Securities Act, which was paterned after Rule 10b–5." *In re Catanella and E.F. Hutton & Co. Sec. Litig.*, 583 F.Supp. 1388, 1439 (E.D.Pa.1984); *see* N.J.Stat.Ann. § 49:3–52 (West 1970 & Supp.1987). However, section 49:3–52 has been held not to create a private right of action. *In re Catanella and E.F. Hutton & Co. Sec. Litig.*, 583 F.Supp. at 1439.

**10.** Section 203(f) must be read in conjunction with N.Y. CPLR § 213, which provides an alternative statute of limitations of six years from accrual. "Accrual" here refers to the time a plaintiff actually suffers a loss as a result of the fraudulent conduct. *See Stull v. Bayard*, 561 F.2d 429, 432 (2d Cir.1977); *see also Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1412 (9th Cir. 1987) ("In fraud cases, a cause of action is generally said to accrue when a defendant commits the last overt injurious act.... In a securities fraud case, the cognizable injury occurs at the time an investor enters ... a transaction as a result of material misrepresentations.") (citation omitted). Section 213 does not aid the plaintiffs in this action. As the fraud asserted actually occurred by September, 1975, section 213's six year limitation lapsed by September, 1981.

**11.** Section 203(f) contains certain exceptions, none of which are applicable to this case. *See* N.Y. CPLR 203(f) (McKinney Supp.1988).

L.Ed. 743 (1946); *Cullen v. Margiotta*, 811 F.2d 698, 725 (2d Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); *Singleton v. City of New York*, 632 F.2d 185, 189–91 (2d Cir.1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981); *Stull*, 561 F.2d at 432. For purposes of actions under section 10(b), as with other federal statutes, "the statute [of limitations] commences to run when the plaintiff has actual knowledge of the alleged fraud or knowledge of facts which in the exercise of reasonable diligence should have led to actual knowledge." *Stull*, 561 F.2d at 432.

■ The court must determine whether a material issue of fact exists regarding the exercise of due diligence by plaintiffs. In this regard, it is of critical importance that the plaintiffs and Gordon were (and possibly still are) partners. Partnerships are creatures of state law. *E.g.*, New York Partnership Law (McKinney 1948 & Supp.1988). Even though the equitable tolling principle is a federal right, it is appropriate to look to state law to determine what constitutes fraudulent concealment under these circumstances. *Cf. Burks v. Lasker*, 441 U.S. 471, 473, 477–80, 99 S.Ct. 1831, 1834, 1836–38, 60 L.Ed.2d 404 (1979) (looking to state law to determine the power of corporate directors to terminate shareholders' derivative suit brought under federal statutes); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726–40, 99 S.Ct. 1448, 1457–65, 59 L.Ed.2d 711 (1979) (adopting state law on priorities to determine priority of federal claims); *Bellis v. United States*, 417 U.S. 85, 95–101, 94 S.Ct. 2179, 2186–90, 40 L.Ed. 2d 678 (1974) (looking to state partnership law to determine whether partnership ex-

isted, for purpose of assertion of federal fifth amendment privilege against self-incrimination). New York, having adopted the Uniform Partnership Act, *see* N.Y. Partnership Law § 1 historical note (McKinney 1948), is an appropriate state to look to for guidance.[12] In New York, when the parties are engaged in a fiduciary relationship, the complaining party can claim the benefit of the fraudulent concealment doctrine even absent an affirmative misrepresentation by the party under the fiduciary duty. In such a relationship, fraudulent concealment occurs if the party under the fiduciary duty fails to meet its "obligation to inform [the other party] of facts underlying the claim." *Jordan v. Ford Motor Co.*, 73 A.D.2d 422, 424, 426 N.Y.S. 2d 359, 360–61 (4th Dep't 1980); *see General Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125, 126–28, 219 N.E.2d 169, 170–71, 272 N.Y.S.2d 337, 338–40 (1966). Gordon, as general partner of Arlington, owed plaintiffs a fiduciary duty. *See Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1078 (2d Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *Ayerslee Corp. v. Overlook Sponsor Corp.*, 618 F.Supp. 1398, 1403 (S.D.N.Y.1985), *aff'd mem.*, 800 F.2d 1127 (2d Cir.1986); *Riviera Congress Assocs. v. Yassky*, 18 N.Y.2d 540, 547, 223 N.E.2d 876, 879, 277 N.Y.S.2d 386, 392 (1966). That duty required him to inform plaintiffs that the value of "The Romantic Englishwoman" was artificially inflated, due at least in part to the purchase of the movie by Arlington from a corporation controlled by Gordon. Accordingly, plaintiffs are entitled to the benefit of some tolling period.

■ The plaintiffs, the victims of the defendant's fraud, are entitled to rely on

---

12. The Supreme Court has spoken of a "consistency" test for the incorporation of state law into federal law. *See Burks v. Lasker*, 441 U.S. 471, 480, 99 S.Ct. 1831, 1838, 60 L.Ed.2d 404 (1979). Generally, this means that federal courts are not to apply state law which poses a "significant threat to any identifiable federal policy or interest," is "unreasonable," or is "specific[ally] aberrant or hostile" to federal policy. *Id.* at 479–80, 99 S.Ct. at 1837–38 (quoting and citing various cases). The alternative is for federal courts to fashion "a nationally uniform body of law." *United States v. Kimbell Foods, Inc.*, 440 U.S.

715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979). As the Uniform Partnership Act has been adopted in forty nine states and the District of Columbia, *see* Unif. Partnership Act Table of Jurisdictions Wherein Act Has Been Adopted, 6 U.L.A. 1 (Supp.1988), New York law on this point may be considered to be national law. The court concludes that incorporation of New York law regarding fraudulent concealment among partners "will furnish an appropriate and convenient measure of the governing federal law." *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1458 (9th Cir.1986).

their confidential relationship with Gordon to toll the statute of limitations "until some event [occurs] which would normally awaken suspicion in the[m]." Dawson, *Undiscovered Fraud and Statutes of Limitation,* 31 Mich. L. Rev. 591, 611 (1933); *see Holmberg v. Armbrecht,* 327 U.S. at 396, 66 S.Ct. at 584 (determination "whether the plaintiff has inexcusably slept on his rights so as to make a decree against the defendant unfair" is decisive in determining whether equity should intervene). The rule is that a wronged party is held to "discover" a wrong, and thereby start the statute of limitations running, not upon actual discovery of the other party's wrong, but "at the point where the facts could have been ascertained by using reasonable diligence." Dawson, *supra,* at 619; *see Klein v. Spear, Leeds, & Kellogg,* 306 F.Supp. 743, 749 (S.D.N.Y.1969) (a plaintiff making allegations against fiduciaries "need only show that he remained in ignorance of the fraud of his fiduciaries without any fault or want of due diligence or due care on his part"); *cf. Simcuski v. Saeli,* 44 N.Y.2d 442, 450, 377 N.E.2d 713, 717, 406 N.Y.S.2d 259, 263 (1978) (in action involving a confidential doctor-patient relationship, court stated that "due diligence on the part of the plaintiff in bringing his action is an essential element for the applicability of the doctrine of equitable estoppel, to be demonstrated by the plaintiff when he seeks the shelter of the doctrine"). Stated another way, in cases involving fiduciary relationships, tolling ceases to work to a plaintiff's benefit when the plaintiff possesses sufficient facts that he must engage in some inquiry, and he fails to live up to this obligation. The plaintiffs bear the burden of demonstrating that they exercised due diligence and reasonable care. *See Hupp v. Gray,* 500 F.2d 993, 996 (7th Cir.1974). The test is an objective one. *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983). In *Armstrong,* the Second Circuit held that

> where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would

have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.

*Id.* (quoting *Higgins v. Crouse,* 147 N.Y. 411, 416, 42 N.E. 6, 7 (1895)). This test is applicable in actions such as this, involving claims of securities fraud. *See id.*

■ The decisive relevant event in this connection was plaintiffs' receipt of the IRS report in June 1984 that placed a value on "The Romantic Englishwoman" of $60,-000.00, a figure that represented only 4.4% of the value Arlington assigned to the movie. The plaintiffs assert that receipt of this information should not be deemed to have created a duty of inquiry in them. Their arguments fall into three categories.

Plaintiffs' *first argument* contends that various indicia led them to conclude that they could ignore the IRS report. For instance, they contend that the IRS regularly undervalues films, and that the figure in the IRS report was part of an "adversarial posture" assumed by the IRS. *See* Plaintiffs' Memorandum in Opposition at 4. Plaintiffs cite no evidence supporting their assertion that the IRS regularly undervalues film investments. Further, they offer no rebuttal to the affidavit of David R. Marcus, an attorney and certified public accountant, which states that IRS valuations represent the Service's "attempt to set forth its best judgment as to the actual value of the movie." Marcus Aff., executed Aug., 1987, at para. 3. In addition, research discloses cases where courts have accepted and adopted figures reached by the Service's experts. *See Baigent v. Commissioner,* 53 T.C.M. (CCH) Dec. 44,-002(M) at 1229 (T.C.1987); *Cooper v. Commissioner of Internal Revenue,* 88 T.C. 84, 110 & n. 14 (T.C.1987); *Falsetti v. Commissioner of Internal Revenue,* 85 T.C. 332, 350 (T.C.1985). The court concludes that plaintiffs' assertion is unreasonable.

Plaintiffs also point to a report in *Variety.* The story lends no support to plaintiffs' position. In the first place, the story was published in December, 1975. Second, it merely states, without any support, the conclusion that "The Romantic English-

woman," while a "[tax] shelter pi[cture]," was being marketed in a "realistic attempt[ ] to generate b[ox] o[ffice] that *could* mean profitable theatrical runs around the country." *See* Exhibit F to Sur Reply Affidavit of Ralph Zola, executed Aug. 3, 1987 (emphasis added). Third, plaintiffs nowhere even allege having seen the *Variety* article at any time prior to the commencement of this litigation. Even if they had, it would not have been reasonable to credit it in the face of the IRS report.

▮ Plaintiffs further argue that they could discount the IRS report because the movie "had, in fact, earned many times the proposed I.R.S. valuation by June, 1984." Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss at 5. This argument depends on an unreasonable interpretation of the function of the valuation. The IRS determines fair market value on the date of acquisition. *See Baigent v. Commissioner*, 53 T.C.M. (CCH) Dec. 44,002(M) at 1229 (T.C.1987). The purpose is to determine whether the transaction was undertaken with the goal of making a profit. *See Deegan v. Commissioner of Internal Revenue*, 787 F.2d 825, 826 (2d Cir.1986) (per curiam). Hence, unanticipated success is irrelevant to this determination. A cursory review of the IRS report in question confirms this: income figures are included, for the purpose of determining allowable deductions. Exhibit A to Weinberg Apr. 24, 1987 Aff. The figures were of no concern to the IRS's three experts. In any event, a reasonable person, even if of the belief the IRS was in error, would not simply have remained passive. Nevertheless, plaintiffs provide no evidence they made any inquiry of the IRS.

▮ Plaintiffs' *second argument* is intended to remedy this defect. Plaintiffs assert that it was not necessary for them to question the IRS because they relied on Gordon's representations that he had his own experts who would value the film at the purchase price. Plaintiffs state that Gordon represented to them "[w]ell after August, 1984" that he "was going to fight" the IRS. *See* Memorandum in Opposition

to Defendant's Motion to Dismiss at 8. The only evidence they cite to support this contention is a letter from Myron Weinberg, Gordon's counsel, to Gordon asking for information necessary to represent him in challenging the IRS. *See* Exhibit E to July 22, 1987 Ralph Zola Affidavit. This letter, however, is dated June 6, 1984, two days earlier than Weinberg's letter to plaintiffs. Additionally, it is a request from counsel for the provision of information, including "[t]he names, addresses and telephone numbers of three experts, any one of whom we can ask to appraise" "The Romantic Englishwoman." No reasonable person would interpret this request from counsel to be the client's vow "to fight." Plaintiffs submit no documentation of any response to this request by Gordon, nor do they submit any evidence indicating that Gordon gave them such information. Furthermore, plaintiffs submit no evidence they requested such information from Gordon after June, 1984. Finally, even assuming Gordon made such a statement, the contention that plaintiffs would have justifiably relied on any such statement is, in light of other evidence, incredible. Ralph Zola received a letter from the IRS dated August 8, 1984. The letter notifies him and his wife that "the promoters of your partnership(s) have been convicted of violations of I.R.C. Section 7206(1), ..., I.R.C. Section 7206(2), ... and Title 18 United States Code, Section 1341,.... Their convictions have been affirmed by the Second Circuit Court of Appeals." *See* Exhibit F to Affidavit of Robert E. Frey, executed Aug. 5, 1987. Further, even without this letter, as a matter of law plaintiffs would not be entitled to rely on "reassuring comments" given them after they received constructive knowledge of the fraud. *See Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir.1987).

Plaintiffs' secondary position is that Gordon sent them a letter dated September 17, 1975, in which he represented that included in the closing documents of sale of the film to Arlington would be expert appraisals of the movie. *See* Amended Complaint at para. 15. Indeed, plaintiffs assert that their participation was contingent on the

receipt by Arlington of such appraisal documentation from outside experts. Accepting plaintiffs' assertions that such a letter was sent as true, it is wholly implausible that they would demand such a letter, and condition their participation in the partnership on receipt of assurances that Arlington would receive "evaluations and/or appraisals from persons deemed to be reliable and known within the industry, certifying their opinion [sic] as to the evaluation of the film which would be no less than the purchase price [of $3,150,000.00]," Amended Complaint at paras. 15(d), 17; *see* Memorandum in Opposition to Defendant's Motion to Dismiss at 14, and then fail to demand to see such documents on receipt of an IRS report placing a value on the movie 95.6% less than the partnership figure. Yet plaintiffs present no facts indicating that they made any inquiry of Gordon, either as to the calculations used to determine the movie's cost, or the names or reports of Gordon's valuation experts. Having received the IRS report in June, 1984, it was not reasonable for plaintiffs to continue to rely on Gordon's representation, made in a letter dated September 17, 1975, *see* Exhibit C to July 14, 1987 Scharwfeld Aff. at para. 9, that he had experts who would support his calculations, without at least asking their names, or asking to see their analyses.

Plaintiffs' *third argument* is that receipt of IRS report was insufficient to place them on notice because it makes no mention of Gordon's particular fraudulent acts, as alleged.[13] What plaintiffs really argue for is a standard of actual knowledge. The law is otherwise. *See Klein v. Shields & Co.,* 470 F.2d 1344, 1345, 1347 (2d Cir.1972)

(party in fiduciary relationship held to have constructive knowledge of fraud from time "at least the possibility of fraud should have been apparent" to him).[14] As stated previously, equitable tolling ceases to operate at the time a person exercising due diligence should have discovered the probability of fraud. *See* discussion *supra* at 364–365. This applies even in cases involving a fiduciary relationship. *See Hupp v. Gray,* 500 F.2d at 997; *cf. Simcuski,* 44 N.Y.2d at 446, 450, 377 N.E.2d at 714, 717, 406 N.Y.S.2d at 261, 263 (use of equitable estoppel in action involving confidential doctor-patient relationship). All that is necessary to cause the tolling period to cease is for there to be reason to suspect the probability of any manner of wrongdoing. *See Klein,* 470 F.2d at 1346–47; *cf. Simcuski,* 44 N.Y.2d at 450, 377 N.E.2d at 717, 406 N.Y.S.2d at 263, where the New York Court of Appeals stated:

> [T]he burden is on the plaintiff to establish that the action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational. Whether in any particular instance the plaintiff will have discharged his responsibility of due diligence in this regard must necessarily depend on all the relevant circumstances.

Due diligence is a standard of constructive knowledge. Particulars of the wrongdoing are uncovered through investigation. Here, plaintiffs received the IRS determination stating that the value of $3,154,-000.00[15] was "highly inflated." The IRS figure of $60,000.00 is so substantially less than Arlington's that the only reasonable inference that can be drawn is that plain-

---

**13.** Plaintiffs assert that the defendants converted monies contributed by the limited partners. *See* Amended Complaint at paras. 19–22; *see also* Plaintiffs' Sur Reply Memorandum at 2 ("nothing in the I.R.S. letter put plaintiffs on notice, suggested, or even hinted, that Gordon and others had engaged in fraud or theft, or that he had utilized dummy corporations to bilk and swindle the plaintiffs"). Allegedly, by selling the movies from a "dummy" corporation controlled by Gordon to Arlington, the defendants were able to divert $250,000.00 of the limited partners' contributions.

**14.** While *Klein* is incorrect in stating that constructive knowledge arises when the party to whom such knowledge is being imputed is aware of the possibility of fraud, *see* 470 F.2d at 1347, rather than when that party is aware of the probability of fraud, *see Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983), the important point is that the case recognizes the existence of the constructive knowledge principle in a case involving a fiduciary relationship, between stockbroker and client. *See Klein,* 470 F.2d at 1345, 1346–47.

**15.** *See* footnote 2 *supra.*

tiffs had a duty to inquire as to the discrepancy. Yet plaintiffs fail to offer even a single letter dated subsequently to June 13, 1984 from them, and addressed to Gordon, that addresses the issue of the film's valuation by the IRS.

Plaintiffs argue that Gordon engaged in fraudulent concealment that continued beyond June, 1984, thus further extending the time in which they could bring suit. Plaintiffs point out that Gordon never revealed to them his conviction in 1982 on federal charges involving fraud in connection with the operation of movie partnerships, including Arlington. *See* Exhibit A to Supplemental Affidavit of Neal Schwarzfeld, executed July 27, 1987. Also, Gordon continued to mail them Arlington's partnership tax statements into 1986, while in no way addressing the dramatic devaluation of the property by the IRS. *See* Exhibit D to Affidavit of Ralph Zola in Opposition to Defendant Gordon's Motion for Summary Judgment, executed July 22, 1987. The suppression of this information simply is irrelevant to plaintiffs' duty to inquire, which was triggered by receipt of the IRS report. *See Hupp,* 500 F.2d at 997 ("the fact which would have put a reasonable person on notice of the possibility of fraud[16] ... was not concealed"). Indeed, the curious and amazing silence on the part of Gordon with respect to the radical downward revision of the film's worth by the IRS cried out loudly for explicit inquiry, and indeed, investigation, by the plaintiffs. Plaintiffs present no facts indicating that they undertook any inquiry whatsoever. The court can reach only one conclusion, that plaintiffs remained narcose. *See Hupp,* 500 F.2d at 996–97 (fiduciary relationship, standing alone, not sufficient to invoke doctrine of fraudulent concealment).[17]

This is not to say that plaintiffs did not react to receipt of the IRS report. On June 15, 1984, within days of receipt of the IRS report, *see* discussion *infra* at 370, Ralph

Zola hired an attorney, James R. Cohen, Esq., to represent the partnership before the IRS. *See* Exhibit I to Affidavit of Neal Schwarzfeld, executed July 14, 1987. Prior to that time, Ralph Zola had represented all three partners before the IRS. He estimated that he spent over two hundred hours on this representation. *See* Deposition of Ralph Zola at 245–46 (Exhibit N to Schwarzfeld July 14, 1987 Aff.). Ralph Zola admitted that he had understood "in the late [19]70's[,] maybe [19]80, that the government was going to challenge the movie on the ground *it wasn't a real movie." Id.* at 249 (emphasis added). This plainly damaging concession by Zola about his frame of mind at least three and one-half years prior to receiving notice of the IRS valuation further erodes the persuasiveness of the claim that he should not have suspected the probability that skulduggery was afoot. Plaintiffs present no evidence to rebut the logical inference that they did in fact consider the report a significant event, as a reasonable person would.

Plaintiffs argue that this case is similar to *Robertson v. Seidman & Seidman,* 609 F.2d 583 (2d Cir.1979). The court in that case reversed a district court grant of summary judgment to defendants on the ground that plaintiffs had constructive knowledge of fraud by a particular date, so that the action had been brought after the statute of limitations had expired. *Id.* at 593. On examination, *Robertson* is inapposite. A detailed explication of the facts of that case is instructive.

The defendants in the case were a firm of certified public accountants, who had audited the books and records of a corporation, and had prepared and certified the accuracy of the corporation's financial documents that were contained in its offering prospectus and registration statement. 609 F.2d at 585. The plaintiff, a shareholder of the corporation whose financial documents the accountants had prepared and

---

**16.** *See* footnote 14 *supra.*

**17.** Had the plaintiffs been able to demonstrate active concealment by Gordon that would have prevented them from learning of the alleged fraud, the statutes of limitations on their section

10(b) claims would have been tolled until they actually discovered the fraud. *See Teamsters Local 282, Pension Trust Fund v. Angelos,* 815 F.2d 452, 456 n. 4 (7th Cir.1987).

certified, *id.*, began to suspect that he had been swindled when he learned that the company's stock had been delisted by the National Association of Securities Dealers Automated Quote System, by which time it had lost eight-five percent of its value. *Id.* at 588. Robertson hired an attorney, cooperated with the Securities Exchange Commission, and eventually intervened in a lawsuit filed against certain underwriters and marketmakers who were charged with market manipulation and other securities laws violations. *Id.* at 586, 588.

The *Robertson* defendants contended that the plaintiff's participation in the lawsuit against the underwriters, which was triggered by an SEC Order for Public Proceedings charging the underwriters and marketmakers with market manipulation, sufficed to charge him with constructive knowledge of their fraud. *Id.* at 588–89. The defendants also argued that certain public information should have put the plaintiff on notice. *Id.* at 589–90.

The first difference between *Robertson* and this action is that the plaintiff there did take steps to determine who had defrauded him. He did hire an attorney to investigate whether he had been defrauded, and he did join a lawsuit against the underwriters and marketmakers. The Second Circuit stated that the plaintiff "believed that only the marketmakers and underwriters were involved in the scheme" at the time of the lawsuit agaginst them. 609 F.2d at 588. Further, "[t]here was nothing in either the SEC's ... Order [for Public Proceedings, charging the underwriters and marketmakers with market manipulation and other securities laws violations in connection with the public offering of the corporation's shares] or the ... action [against the underwriters and marketmakers] which indicated any involvement on the part of [the corporation's accounting firm,] Seidman & Seidman." *Id.* at 589. The underwriters and marketmakers could have duped the accountants, manipulated them without the accountants' knowledge. Robinson argued he was entitled to believe the underwriters and marketmakers had manipulated the innocent accountants, at least while there was no evidence that pointed "conclusive-ly" or "specifically" to the judgment that the accountants were willing collaborators in the fraudulent scheme. *Id.* at 591. He argued that he had discovered nothing "which would have led even the most sophisticated investor to conclude that [the accountants] w[ere] involved in any way in the fraud." *Id.*

The Second Circuit held that it was reasonable to infer from the facts that Robinson was entitled to believe that the accountants, who had no obvious motive to participate in the fraud, had merely been the unwitting instruments of the underwriters and marketmakers. *Id.* at 591–93. For that reason, the court reversed the district court's grant of summary judgment, which had been based on the lapsing of the statute of limitations. *See id.* at 591, 593–94 ("When conflicting inferences can be drawn from the facts, ... summary judgment is inappropriate."). The fact that the plaintiff did investigate his claim was an important consideration supporting the court's conclusion that conflicting inferences could be drawn from the facts. *See id.* at 591 ("[Plaintiff]'s suspicions ... *were* raised.") (emphasis in original).

The defendants in this action are not incidental actors to the specific transaction in question, to whom suspicion would not immediately attach in the event of wrongdoing, on the assumption that they also may have been duped by other, more principal actors, as were the accountant defendants in *Robertson*. Rather, the defendants here are the issuers of the securities alleged to have been sold illegally and fraudulently. They are the ones to whom suspicion should immediately attach, if the probability of fraud should arise. The issuance of the IRS determination, after an investigation of at least three years, which investigation plaintiffs were aware of during its course, should have alerted them to undertake some investigation against these defendants, who obviously were the ones most likely to be responsible for any fraud. *See Robertson*, 609 F.2d at 588; *cf. id.*, 609 F.2d at 592 (as matter of law, earliest time statute of limitations could have started against the accountants was when SEC dis-

covered their complicity in the scheme to defraud); *Arneil v. Ramsey*, 550 F.2d at 781–82 (issuance of SEC release containing admission of willful violations of securities laws sufficient to start statute of limitations). The defendants here cannot be equated with the accountants in *Robertson*, and the plaintiffs here cannot be equated with Robinson, who presented facts that permitted the inference that he had pursued his rights diligently. *See* 609 F.2d at 588.

When a party has made a sufficient showing to warrant summary judgment, the opposing party is obliged to come forward with affidavits or other properly qualified evidence to demonstrate there is a material issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *De Villar v. City of New York*, 628 F.Supp. 80, 83 (S.D.N.Y.1986). While doubts must be resolved in favor of the party opposing the summary judgment motion, that party must provide "concrete particulars" showing that trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984); *Soler v. G & U, Inc.*, 615 F.Supp. 736, 740 (S.D.N.Y.1985).

These plaintiffs present no facts demonstrating that a genuine issue exists as to whether they exercised due diligence. As a matter of law, receipt of the IRS report is sufficient to impute constructive knowledge of the probability of fraud to plaintiffs. A reasonable person of ordinary intelligence [18] would have considered the IRS report, which valued "The Romantic Englishwoman" at $60,000.00, a figure 95.6% less than the $3,150,000.00 at which Arlington valued the film, to suggest the probability plaintiffs had been defrauded. The

court does not deem the salient facts of the IRS report and plaintiffs' "subsequent inactivity to be either disputed or susceptible of conflicting inferences." *See Hupp*, 500 F.2d at 997 & n. 5. The court therefore concludes that knowledge of the fraud must be imputed to the plaintiffs on receipt of the letter from Myron Weinberg, which included a copy of the IRS report. The period of equitable tolling ceases at that time.

Weinberg states in his affidavit that it was his general practice to mail letters on the date appearing on the particular letter. Weinberg Aff. at para. 3. If the letter is not mailed on the date reflected on the letter, Weinberg has the date changed. *Id.* The letter to Ralph Zola is dated June 8, 1984. The Federal Rules of Civil Procedure state that mail is presumed to take three days for delivery. Fed.R.Civ.P. 6(e). When a period involved is less than eleven days, intermediate Saturdays and Sundays are excluded. Fed.R.Civ.P. 6(a). June 8, 1984 fell on a Friday. *See* Am Jur 2d Desk Book, Item No. 178, Calendar No. 8. Weinberg's letter should have been received no later than June 13, 1984. *See id.* [19] Thus, the court concludes that this is the date when plaintiffs had knowledge of Gordon's fraud.

The New York statute of limitations is four years shorter than the New Jersey statute of limitations. *See* discussion *supra* at 363–364. The court must apply the former. Excluding June 13, 1984 from the calculation of the period, because it is the date knowledge of the fraud is imputed to plaintiffs, Ralph and Paul Zola's causes of action under section 10(b) lapsed on June 13, 1986. The complaint, filed five days later, on June 18, 1986, thus was untimely

---

**18.** Ralph Zola is a practicing lawyer with degrees from the Wharton School and Harvard Law School. *See* Deposition of Ralph Zola at 5–6 (Exhibit M to Neal Schwarzfeld July 14, 1987 Aff.). Paul Zola holds degrees from Columbia University and Harvard Law School, as well as two masters degrees and a doctorate. He worked for the Enforcement Division of the Securities Exchange Commission from 1962 to 1964 or 1965. *See* Deposition of Paul Zola at 5–6 (Exhibit L to Schwarzfeld July 14, 1987 Aff.).

**19.** Plaintiffs do not dispute receipt of the letter. In fact, the letter was produced as part of records maintained by their outside tax counsel, James Cohen. *See* Affidavit of Neal Schwarzfeld in Support of Motion for Summary Judgment, executed July 14, 1987, at para. 6. It is reasonable to conclude that Ralph Zola showed the letter to Cohen when he hired him, on June 15, 1987. *See* discussion in text, *supra* at 368.

and is barred. Summary judgment is granted to defendant Gordon on this claim against these plaintiffs.

Plaintiff Irving Zola is a resident of Florida. The applicable statute of limitations in that state is contained in section 95.11(4)(e) of the Florida Statutes:

> An action founded upon a violation of any provision of chapter 517[, "Florida Securities and Investor Protection Act,"] [must be brought within two years], with the period running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence, but not more than 5 years from the date such violation occurred.

Fla.Stat.Ann. § 95.11(4)(e) (West Supp. 1988); *id.* § 517.011 et seq. (West Supp. 1988) (title of chapter);[20] *see Armbrister v. Roland Int'l Corp.,* 667 F.Supp. 802, 823 (M.D.Fla.1987); *Byrne v. Gulfstream First Bank & Trust Co.,* 528 F.Supp. 692, 693–94 (S.D.Fla.1981), *aff'd mem.,* 720 F.2d 686 (11th Cir.), *reh'g en banc denied mem.,* 723 F.2d 920 (11th Cir.1983); *Attache Resort Motel, Ltd. v. Kaplan,* 498 So.2d 501, 502, 504 (Fla.3d Dist.Ct.App.1986).

Section 95.11(4)(e) is similar to section 13 of the '33 Act in that it has two components. Under section 95.11(4)(e), an action must be brought within two years of actual or constructive discovery *and* within five years from the sale of the security. It is not necessary to decide whether this five year component must be viewed as an absolute outside limitation, similarly to section 13 of the '33 Act, *see* discussion *supra* at 360–363 & n. 7, because it contains a two year from discovery component. In that respect it is equivalent to New York's statute.

As Irving Zola was a partner in Biscayne Associates, the knowledge of his partners is imputed to him. *See, e.g., NLRB v. Broad St. Hosp. & Medical Center,* 452 F.2d 302, 304 n. 1 (3d Cir.1971); *Friend v. H.A. Friend & Co.,* 416 F.2d 526,

533 (9th Cir.1969), *cert. denied,* 397 U.S. 914, 90 S.Ct. 916, 25 L.Ed.2d 94 (1970); *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.,* 650 F.Supp. 1378, 1386 (W.D.Va.1986); *Engl v. Berg,* 511 F.Supp. 1146, 1154 (E.D.Pa.1981); *Heather Cos. v. Amano (In re Heather Cos.),* 36 B.R. 863, 866 (Bankr.N.D.Ill.1984); *Howard v. Hamilton,* 28 N.C.App. 670, 675, 222 S.E.2d 913, 917 (1976). Thus, the statute of limitations on his section 10(b) claim began to run at the same time it did for Ralph and Paul Zola. It lapsed on June 13, 1986. Irving's section 10(b) claim is time-barred. Defendant Gordon is granted summary judgment on this claim.

### Section 17(a)

Section 17(a) of the '33 Act, 15 U.S.C. § 77q(a) (1982), entitled "Fraudulent Interstate Transfers," is similar to section 10(b) of the '34 Act in that it is a fraud-based cause of action and it does not contain any statute of limitations itself. Courts have applied the same statute of limitations analysis to section 17(a) claims as to section 10(b) claims. *E.g., Klein v. Shields & Co.,* 470 F.2d 1344, 1346–47 (2d Cir.1972); *Bader v. Fleschner,* 463 F.Supp. 976, 980–82 (S.D.N.Y.1978). Thus, plaintiffs' section 17(a) claims are time-barred for the same reasons that their section 10(b) claims are barred.

### Section 20(a)

Section 20(a) of the '34 Act generally posits liability against "[e]very person who, directly or indirectly, controls any person liable under any provision of [the '34 Act]." 15 U.S.C. § 78t(a) (1982). The statute of limitations applicable to this claim is the same as that applicable to the section 10(b) claim against the "controlled person." *Herm v. Stafford,* 663 F.2d 669, 679 (6th Cir.1981); *Arneil v. Ramsey,* 550 F.2d 774, 779–82 (2d Cir.1977); *Klock v. Lehman Bros. Kuhn Loeb Inc.,* 584 F.Supp. 210, 216 (S.D.N.Y.1984). Thus, as the section 10(b) claims are time-barred, plaintiffs' sec-

**20.** The Florida Securities and Investor Protection Act contains a section, Fla.Stat.Ann. § 517.301 (West Supp.1988), that is the equivalent of section 10(b) and Rule 10b–5. *See Byrne v. Gulfstream First Bank & Trust Co.,* 528 F.Supp. 692, 694 & n. 2 (S.D.Fla.1981), *aff'd mem.,* 720 F.2d 686 (11th Cir.), *reh'g en banc denied mem.,* 723 F.2d 920 (11th Cir.1983).

tion 20(a) claims likewise are time-barred. *See Arneil*, 550 F.2d at 779–82. The court grants Gordon summary judgment on these claims.

### 2. *Plaintiff's RICO claim* [21]

RICO actions are subject to a four year statute of limitations. *Agency Holding Corp. v. Malley–Duff & Assocs.*, —— U.S. ——, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). As with plaintiffs' other claims, the date the statute of limitations begins to run is governed by federal law. This general principle is applicable to RICO actions. *See Cullen v. Margiotta*, 811 F.2d 698, 703–04, 724–25 (2d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); *accord Bowling v. Founders Title Co.*, 773 F.2d 1175, 1178 (11th Cir.1985), *cert. denied*, 475 U.S. 1109, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986); *Compton v. Ide*, 732 F.2d 1429, 1433 (9th Cir.1984); *see also Bankers Trust Co. v. Feldesman*, 648 F.Supp. 17, 36 (S.D.N.Y.1987) (same). Plaintiff's RICO claim, filed two years and five days after the statute of limitations began to run, is timely.

▮▮▮ Gordon also attacks the RICO claim, count six of the amended complaint, as not being pleaded consistently with Rule 9(b). The alleged predicate acts are the sale of the limited partnership interest (securities fraud) and the sending of a letter concerning the sale (mail fraud). For the RICO count to stand, each of these predicate acts must meet Rule 9(b)'s requirement that "the circumstances constituting fraud ... be stated with particularity." *See Limited, Inc. v. McCrory Corp.*, 645 F.Supp. 1038, 1041, 1047 (S.D.N.Y.1986). "The 'circumstances' constituting fraud means 'matters such as time [sic], place, and contents of the false representations, as well as the identity of the person making the misrepresentation.'" *Id.* at 1041 (quoting *Robertson v. National Basketball Ass'n*, 67 F.R.D. 691, 697 (S.D.N.Y.1975)).

The securities fraud claim indisputably is pleaded sufficiently. Plaintiffs claim the offering memorandum for the limited partnership interests fraudulently stated the cost of the film to be $650,000.00 in cash and $2,500,000.00 in a non-recourse note. Defendant Gordon allegedly failed to tell plaintiffs that the film was being purchased from a "dummy" corporation he controlled, which had purchased the film at a cost of $400,000.00 in cash and $2,500,-000.00 in a non-recourse note. Thus, the amended complaint "adequately details the nature and essential factual elements of the alleged fraud so that it is possible for defendants to determine from plaintiff[s'] allegations the general time, place, and contents of these alleged fraudulent omissions." *Limited, Inc.*, 645 F.Supp. at 1042.

The mail fraud claim rests on allegations that a letter mailed on or after September 17, 1975 contained fraudulent assertions of fact regarding the use of proceeds from the offering for the limited partnership, the inclusion in the closing documents of sale to Arlington of a certification and budget reflecting the cost of the movie, and evaluations or appraisals of the value of the film. It too indisputably is pleaded sufficiently to place Gordon on notice of the claim against him. The elements of an indictable offense under the federal mail fraud statute are "(1) the existence of a scheme to defraud, and (2) the use of the mails ... in furtherance of the fraudulent scheme." *In re Gas Reclamation, Inc. Sec. Litig.*, 659 F.Supp. 493, 512 (S.D.N.Y. 1987) (quoting *Tryco Trucking Co. v. Belk Stores Servs.*, 634 F.Supp. 1327, 1333 (W.D. N.C.1986)). Plaintiffs have pleaded a scheme to defraud (fraudulent sales of limited partnership interests) and use of the mails to further the scheme (the September 17 letter).

▮▮▮ Gordon argues as a second point that the letter was mailed subsequent to

---

**21.** Plaintiffs fail to specify which sections of 18 U.S.C. § 1962 were violated by defendants. Having read the complaint, the court concludes that they allege violations of section 1962(c), because the real nature of their claim appears to flow from the allegations that the predicate acts

induced them to invest in Arlington, *see In re Gas Reclamation, Inc. Sec. Litig.*, 659 F.Supp. 493, 511 (S.D.N.Y.1987), and section 1962(d), because they allege a conspiracy to engage in the predicate acts (the section 1962(c) violation).

the time Biscayne purchased its interest in Arlington, and hence could not have been relied upon by plaintiffs, or sent in furtherance of the scheme to defraud. This contention is not persuasive. The law is clear that a letter mailed after the victim has parted with his money suffices to support a mail fraud claim if it is intended to lull the plaintiff into a false sense of security. *United States v. Lane*, 474 U.S. 438, 451–52, 106 S.Ct. 725, 733–34, 88 L.Ed.2d 814 (1986); *United States v. Otto*, 742 F.2d 104, 108 (3d Cir.1984), *cert. denied*, 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985); *United States v. Jones*, 712 F.2d 1316, 1320–21 (9th Cir.), *cert. denied*, 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983); *see United States v. Sampson*, 371 U.S. 75, 80–81, 83 S.Ct. 173, 175–76, 9 L.Ed. 2d 136 (1962). One can make the reasonable inference from the amended complaint that this letter at least was mailed with that intent.

■ Gordon's final argument is that the amended complaint fails to allege adequately the existence of an "enterprise." He points out that to be an actionable RICO enterprise an association in fact, such as is alleged between himself and Wagner, must have "an existence beyond that which is merely to commit each of the acts charged as predicate racketeering offenses." *United States v. Riccobene*, 709 F.2d 214, 223–24 (3d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983); *see United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed. 2d 246 (1981); *Town of Kearny v. Hudson*

*Meadows Urban Renewal Corp.*, 648 F.Supp. 1412, 1416 (D.N.J.1986) ("the organization must be an entity separate and apart from the 'pattern' of activity in which it engages"), *rev'd on other grounds*, 829 F.2d 1263 (3d Cir.1987).

Gordon's argument is without merit. The amended complaint clearly alleges that Gordon and Wagner participated in numerous schemes separate and apart from the predicate acts undertaken to market "The Romantic Englishwoman" fraudulently. *See* Amended Complaint at paras. 39–53. "Participation in ... similar scheme[s] is sufficient to establish that the enterprise existed separate and apart from the predicate acts." [22] *Town of Kearny*, 648 F.Supp. at 1417; *see Riccobene*, 709 F.2d at 224.

### 3. *Plaintiffs' State Law Claims*

■ The first cause of action, for fraud, is time-barred. *See* discussion of section 10(b) of the '34 Act *supra* at 363–371. The second cause of action, conversion, is timely under the shortest of the alternative statutes of limitations, New York's.[23] CPLR 206(a)(1) incorporates the discovery rule into conversion actions involving money held by one acting in a fiduciary capacity. N.Y. CPLR § 206(a)(1) (McKinney 1972). The length of the statute of limitations for actions in conversion is three years. *Id.* § 214(3). As the plaintiffs initiated this action less than three years from the time they should have discovered the conversion,[24] they are within the statute of limitations.

**22.** Plaintiffs' allegation of multiple schemes satisfies even the most restrictive Second Circuit view of a RICO "enterprise." *See Beauford v. Helmsley*, 843 F.2d 103, 110 (2d Cir.1988) ("a single criminal episode or scheme does not charge a claim under RICO because it lacks sufficient continuity to constitute an enterprise, even if its fraudulent acts constitute a pattern").

**23.** New Jersey has incorporated the discovery rule into its six-year statute of limitations for conversion actions. *See O'Keeffe v. Snyder*, 83 N.J. 478, 489–94, 416 A.2d 862, 868–70 (1980). Though there is no definitive ruling in Florida, and the lower courts are in conflict, *compare Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*, 450 So.2d 1157, 1161–63 (Fla. 3d Dist.Ct.App.1984) (discovery rule incorporated

into four-year statute of limitations) *with Bove v. PBW Stock Exch., Inc.*, 382 So.2d 450, 452–54 (Fla. 2d Dist.Ct.App.1980) (four-year statute of limitations begins to run at time of conversion, unless fraudulent concealment exists), the present case fits within the narrower confines of *Bove*. *See* 382 So.2d at 453 (limitations period tolled until discovery where converter is under fiduciary duty to injured party).

**24.** The complaint was served on Gordon on August 11, 1986. Under New York law regarding commencement of actions, which is applicable in federal court to plaintiffs' state law claims, *see Walker v. Armco Steel Corp.*, 446 U.S. 740, 750–53, 100 S.Ct. 1978, 1985–86, 64 L.Ed.2d 659 (1980) (state law regarding commencement

■ Gordon raises a second objection to the conversion claim. He points out that "[a]s a general rule, in a going partnership a partner may not sue another partner at law for conversion of or injury to partnership property and is limited to an action in equity for an accounting." *Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057, 1075 n. 23 (2d Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978). It is also true, though, that "[a]fter dissolution, or conclusion of business, a partner may maintain an action at law for assets which were ... misappropriated." J. Crane & A. Bromberg, The Law of Partnership § 69 at 402 (1968) (citing *Mumm v. Adam,* 134 Colo. 493, 499, 307 P.2d 797, 800 (1957) (en banc) (collecting cases)), *cited in Gross,* 563 F.2d at 1075–76 n. 23; *see also Laymon v. McComb,* 524 F.Supp. 1091, 1096 (D.Colo.1981) (same). The complaint is defective in that it nowhere alleges the current status of Arlington. Therefore, this claim is dismissed without prejudice to replead the status of Arlington and the appropriate cause of action.

■ The third "claim" is for "recision" [sic] of the agreement. Rescission is only a remedy, not a cause of action. *See, e.g., Canfield v. Reynolds,* 631 F.2d 169, 178 (2d Cir.1980); *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 895 (2d Cir.1976); *Manning v. Manning,* 97 A.D.2d 910, 911, 470 N.Y.S.2d 744, 746–47 (3d Dep't 1983) *(mem.).* This cause of action is dismissed with prejudice.

■ The fourth claim, for breach of fiduciary duty, is not time-barred against any of the plaintiffs, as Gordon asserts. As to Ralph and Paul Zola, the statute of limitations in New Jersey would appear to be, although research has failed to disclose any case on point, six years from discovery. *See* discussion of N.J.Stat.Ann. § 2A:14–1 (West 1987) *supra* at 363. New York's six year statute of limitations on this cause of action, *see Dolmetta v. Uintah Nat'l Corp.,* 712 F.2d 15, 19 (2d Cir.1983); *Public Serv. Co. v. Chase Manhattan Bank, N.A.,* 577 F.Supp. 92, 102, 109 (S.D.N.Y.1983); *Loengard v. Santa Fe Indus.,* 70 N.Y.2d 262, 267, 514 N.E.2d 113, 115, 519 N.Y.S.2d 801, 804 (1987); N.Y. CPLR § 213(1) (McKinney Supp.1988), similarly does not commence running until the plaintiff has actual or constructive knowledge of the breach. *Chase Manhattan Bank, N.A.,* 577 F.Supp. at 109; *Dumbadze v. Lignante,* 244 N.Y. 1, 3–4, 6–9, 154 N.E. 645, 645, 646–47 (1926); *Wood v. Young,* 141 N.Y. 211, 218, 36 N.E. 193, 194 (1894) (dictum); *Montgomery Ward & Co. v. Weber,* 7 Misc.2d 465, 466, 162 N.Y.S.2d 744, 746 (Sup.Ct.1957); N.Y. CPLR § 206(a)(1); 36 NY Jur, Limitations and Laches § 82 (Lawyers Cooperative Publishing Co.1964).[25]

As to Irving Zola, in Florida an action for breach of fiduciary duty is founded on a statutory liability. *See* Fla.Stat.Ann. § 733.609 (West 1976). Such an action is governed by a four-year statute of limitations. Fla.Stat.Ann. § 95.11(3)(f) (West 1982). This statute of limitations does not commence running until a plaintiff has discovered the existence of his cause of action. *See Van Dusen v. Southeast First Nat'l Bank,* 478 So.2d 82, 91–92 (Fla. 3d Dist.Ct.App.1985).

applicable in action brought under court's grant of diversity jurisdiction); *Hunnewell v. Manufacturers Hanover Trust Co.,* 628 F.Supp. 759, 761 (S.D.N.Y.1986) (federal court sits as state court with respect to pendent claims, and is bound by principles of state law), this is the date the action is deemed to have commenced on those claims. N.Y. CPLR § 304 (McKinney 1972).

**25.** Gordon cites *Dolmetta v. Uintah National Corporation,* 712 F.2d 15 (2d Cir.1983), for the proposition that the statute of limitations begins to run when the breach of fiduciary duty occurs. The court in *Dolmetta* rejected the label of breach of fiduciary duty, stating that the cause of action sounded in fraud. *See id.* at 19. The court held in the alternative that, analyzing the claim as one for breach of fiduciary duty, more than six years had passed from the time the liquidators had taken control of the bank's affairs. *See id.* One can infer that at that time the liquidators were presumed to have acquired at least constructive knowledge of the wrong. *See id.* The court also notes that *Dolmetta* nowhere mentions N.Y. CPLR § 206(a)(1), *see id.* at 18–20, which undoubtedly is applicable to this case, if not that one.

**B. Wagner's Motion to Dismiss**

Defendant Wagner is named only in the RICO count. He moves to dismiss this count. "[W]here multiple defendants are alleged to have participated in the fraud, reasonable notice of the part each defendant is to have played in the scheme" must be given. *Limited, Inc. v. McCrory Corp.*, 645 F.Supp. 1038, 1043 (S.D.N.Y.1986); *see SEC v. Cable/Tel Corp.*, 90 F.R.D. 662, 664 (S.D.N.Y.1981). The amended complaint alleges, without factual support, that Gordon and Wagner acted together. *See generally* Amended Complaint paras. 7–12, 15, 38–54. Plaintiffs argue on information and belief that Wagner "developed" the misrepresentations contained in the offering memorandum "acting together" with Gordon and that Wagner also is responsible for the letter of September 17, 1975 which, as plaintiffs concede, was sent out over Gordon's signature. *See* Memorandum of Law in Opposition to Motion to Dismiss by Defendant Wagner, filed Sept. 18, 1987, at 3.

 Plaintiffs' arguments are insufficient to warrant holding Wagner as a potential primary violator of RICO. Assertions, unsupported by any alleged facts, against an individual defendant fail to satisfy Rule 9(b). The complaint must factually connect Wagner with fraudulent statements made to the plaintiffs. *See Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir.1986); *Zerman v. Ball*, 735 F.2d 15, 22–23 (2d Cir.1984). Further, broad allegations of aiding and abetting may not be used to meet the requirement of 18 U.S.C.A. § 1961(5) (West Supp.1987) that at least two acts of racketeering per defendant be alleged. *United States v. Bonanno Organized Crime Family*, 683 F.Supp. 1411 (E.D.N.Y.1988).

 Civil RICO liability can be predicated on aiding and abetting the commission of the predicate acts by the primary offender. *See Petro–Tech, Inc. v. Western Co. of N. Am.*, 824 F.2d 1349, 1356 (3d Cir.1987); *Armco Indus. Credit Corp. v. SLT Warehouse Co.*, 782 F.2d 475, 485–86 (5th Cir. 1986); *Laterza v. American Broadcasting Co.*, 581 F.Supp. 408, 412 (S.D.N.Y.1984). However, in pleading such liability all of RICO's other requirements must be met. *Petro–Tech, Inc.*, 824 F.2d at 1356. So, for claims based on fraud, the plaintiffs must provide factual allegations showing how Wagner participated as an aider and abettor in the requisite predicate acts.[26] *Laterza*, 581 F.Supp. at 412. The present complaint adequately alleges aider and abettor liability on the securities fraud claim. *Compare* Amended Complaint at paras. 11–12, 48 (Wagner set up the dummy corporation through which the defendants sold the film to Arlington at an inflated price) *with Westland Energy 1981–1 Ltd. v. Bank of Commerce & Trust Co.*, 603 F.Supp. 698, 700, 702, 707 (N.D.Okla.1984) (allegations that general partner of limited partnership purchased equipment from companies controlled by promoter sufficient to allege aider and abettor liability against those companies). However, the amended complaint lacks factual assertions supporting aider and abettor liability on the mail fraud claim.[27]

**26.** The Second Circuit recognizes aider and abettor liability for securities fraud. *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62–63 (2d Cir.1985); *see also Petro–Tech, Inc. v. Western Co. of N. Am.*, 824 F.2d 1349, 1357 (3d Cir.1987) ("While the Supreme Court has reserved the issue, ..., every circuit court to have addressed the question has held that there can be civil liability for aiders and abettors of securities laws violations.") (citation omitted).

Similarly, one may be liable as an aider and abettor of mail fraud. *See United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir.1986), *aff'd*, — U.S. —, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

**27.** To allege aider and abettor liability generally, a plaintiff must allege three elements: first, the existence of an independent wrong committed by the primary offender; second, the rendering of substantial assistance to the primary wrongdoer by the aider and abettor; and, third, the requisite scienter on the aider and abettor's part. *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir.1985); *Troyer v. Karcagi*, 476 F.Supp. 1142, 1151 (S.D.N.Y.1979). The amended complaint lacks any factual allegation as to how Wagner provided substantial assistance to Gordon in the mail fraud. *Compare* Amended Complaint at para. 15 ("Defendants GORDON and WAGNER made additional misrepresentations in a letter dated September 17, 1975") *with United States v. Win-*

■ In conclusion, the amended complaint fails to include any facts from which the court reasonably could infer that Wagner engaged in two predicate acts, either as a primary violator or as an aider and abettor. The only other possible claim under section 1962(c) plaintiffs could make is a conspiracy charge against Wagner. In the RICO count of the amended complaint, plaintiffs do allege that Gordon and Wagner were members of a conspiracy. *See* Amended Complaint at paras. 43, 49, 51. Typically, the amended complaint fails to state whether this is a common law conspiracy to commit RICO predicate acts, in which case the conspiracy itself is a predicate act that may lead to liability, *see United States v. Weisman,* 624 F.2d 1118, 1123–24 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980),[28] or a RICO conspiracy, violative of 18 U.S.C. § 1962(d) (1982). Turning first to the common law conspiracy, liability under section 1962(c) obtains if the conspiracy involves "any of the substantive offenses listed in section 1961(1)(D)," *Weisman,* 624 F.2d at 1123–24, which includes securities fraud. *See* 18 U.S.C.A. § 1961(1)(D) (West Supp. 1987). "A claim of conspiracy to defraud must allege, *inter alia,* facts sufficient to support a finding of an agreement among those alleged to be part of the conspiracy." *Troyer v. Karcagi,* 476 F.Supp. 1142, 1153 (S.D.N.Y.1979). These allegations must comply with the dictates of Fed.R.Civ.P. 9. *Id.*

■ Plaintiffs' amended complaint suffices to allege a common law securities fraud conspiracy against Wagner. All they need do is plead "with enough specificity to inform multiple defendants of facts forming the basis of the conspiracy charge.... Such allegations must 'delineate among the defendants [as to] their participation or responsibilities' in making the statements which are the subject of the suit." *Van Schaick v. Church of Scientology of Cal., Inc.,* 535 F.Supp. 1125, 1141 (D.Mass.1982) (citations omitted, bracketed material in original) (quoting *Lerman v. ITB Management Corp.,* 58 F.R.D. 153, 155 n. 2 (D.Mass.1973)). The amended complaint alleges that Wagner established the dummy corporation, Cinepex Establishment Corporation, para. 48, through which Gordon purchased the film for Arlington at an inflated price, para. 12, and that Wagner distributed the profits, reflected by the price difference, amongst himself, Gordon, and others, para. 48. These facts put Wagner on notice of exactly what he is charged with. Furthermore, these facts are sufficient to support a finding of an agreement between Wagner and Gordon.

■ The conspiracy claim, like the aiding and abetting claim, is only one predicate act.[29] By itself, it cannot form a "pat-

*ans,* 612 F.Supp. 827, 850 (S.D.N.Y.1985) (one defendant aided and abetted mail fraud committed by others by endorsing checks, and by allowing another defendant to trade in his name in his accounts at two brokerage houses), *modified on other grounds sub nom. United States v. Carpenter,* 791 F.2d 1024 (2d Cir.1986), *aff'd,* — U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

28. Though research has failed to disclose any *civil* action in which conspiracy was charged as a predicate act under section 1962(c), the court opines that it is appropriate. 18 U.S.C. § 1964(c) permits "[a]ny person injured in his business or property by reason of a violation of section 1962" to bring a civil suit. Section 1962(c) in turn makes it "unlawful for any person employed by or associated with an enterprise" to conduct "such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c) (1982). "Racketeering activity" includes "*any offense* involving ... fraud in the sale of securities." 18 U.S.C.A. § 1961(1)(D)

(West Supp.1987) (emphasis added). Conspiracy to engage in securities fraud is "an offense." *See, e.g., United States v. Corr,* 543 F.2d 1042, 1044 (2d Cir.1976). Thus, this is an appropriate "act of racketeering" that may constitute part the basis for standing in a civil RICO action. *Cf. Petro–Tech, Inc. v. Western Co. of N. Am.,* 824 F.2d 1349, 1356–57 (3d Cir.1987) ("Through the criminal law ... aiding and abetting has also become a basis for civil liability under the federal securities laws," and can lead to civil RICO liability).

29. Although one can conspire to commit mail fraud, *see, e.g., United States v. Shelton,* 669 F.2d 446, 451 (7th Cir.), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982), the indictable offense is the conspiracy, charged under the conspiracy statute (18 U.S.C. § 371 (1982)), not under the mail fraud statute (18 U.S.C. § 1341 (1982)). *Id.* RICO defines "racketeering activity" to mean, in relevant part, "any act which is indictable under ... title 18, United

tern of racketeering," which requires at least two acts of racketeering. 18 U.S.C.A. § 1961(5) (West Supp.1987). Thus, plaintiff's claim under section 1962(c) fails to state a cause of action.

Plaintiffs' RICO conspiracy allegation also fails to state a claim against Wagner. 18 U.S.C. § 1962(d) (1982) requires an allegation that a defendant "himself at least agreed to commit two or more predicate crimes." *United States v. Ruggiero*, 726 F.2d 913, 921 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). It is not sufficient to allege that Wagner "conspired with others to engage through an enterprise in a pattern of racketeering activity of predicate acts committed by others." *Id.; accord United States v. Winter*, 663 F.2d 1120, 1136 (1st Cir.1981) ("a RICO conspiracy count must charge as a minimum that each defendant agreed to commit [personally] two or more specified predicate crimes"), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983); *see also Grunwald v. Bornfreund*, 668 F.Supp. 128, 133 (E.D.N.Y.1987) (same). In conclusion, the amended complaint fails to allege a violation of either section 1962(c) or 1962(d) by Wagner. The RICO claim is dismissed against him without prejudice to replead.

Wagner also moves for dismissal based on defective service of process under Rule 4(j). Plaintiffs failed to serve the complaint on Wagner until at the earliest some eight months after they filed it with the Clerk. Plaintiffs' excuse, that they served another individual named Edward Wagner, is not good cause for this lengthy delay that might excuse their failure. *See* Rule 4(j). In this circuit, the appropriate procedure in such circumstances, where the defendant still may be served within the limitations period, is to quash the service, rather than dismiss the action on this ground. *See Grammenos v. Lemos*, 457 F.2d 1067, 1071 (2d Cir.1972); *Rankel v. Town of Greenburgh*, 117 F.R.D. 50, 54 (S.D.N.Y.1987); *Daley v. ALIA*, 105 F.R.D. 87, 89 (E.D.N.Y.1985). Should the plaintiffs further amend their complaint to allege a cause of action against Wagner, they should serve Wagner with a copy of the Summons and the newly amended complaint.

### C. Gordon's Motion to Review the Magistrate's Order

Because the claim for conversion has been dismissed without prejudice, this motion is moot. Should plaintiffs amend their complaint to include a claim for either conversion or an accounting, Gordon's counsel is directed to notify the court by letter that Gordon wishes to renew the motion.

### D. Gordon's Motion for a Protective Order

This motion similarly is denied as moot. Counsel for Gordon is directed to notify the court if the motion is renewed.

### E. Wagner's Motion for Sanctions

Wagner seeks the imposition of sanctions pursuant to Fed.R.Civ.P. 11. Violation of Rule 11 mandates imposition of sanctions. *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1174–75 (D.C.Cir.1985); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 n. 7 (2d Cir.1985), *cert. denied*, — U.S. —, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). Wagner's principle contention is that plaintiffs failed to undertake a reasonable inquiry into the facts before asserting falsely that Wagner "was one of the attorneys to the partnership." Amended Complaint at para. 8.

States Code ... section 1341." 18 U.S.C.A. § 1961(1)(B) (West Supp.1987). Thus, conspiracy to commit mail fraud may not be attributed to Wagner as a predicate act. *See United States v. Ruggiero*, 726 F.2d 913, 919–20 (2d Cir.) (conspiracy to conduct illegal gambling business not indictable under 18 U.S.C. § 1955, which is included as racketeering activity under 18 U.S.C.A. § 1961(1)(B), so that "conspiracy to violate § 1955 is not an act of racketeering activity"),

*cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 160 (1984); *United States v. Weisman*, 624 F.2d 1118, 1123–24 (2d Cir.) (conclusion that conspiracy to commit offenses listed in section 1961(1)(D) is a predicate act within RICO "bolstered" by fact subsections (B) and (C) "require that the act be indictable under specifically enumerated sections of the criminal code"), *cert. denied*, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980).

For support, Wagner points to the offering memorandum. That document, in the section on use of proceeds by Arlington, states that Murray Glantz[30] is to receive twenty thousand dollars for acting as Arlington's attorney. *See* Exhibit L to Affidavit of Robert Frey in Support of Wagner's Motion to Dismiss, executed Aug. 5, 1987. Second, Wagner points to a letter dated June 16, 1975, from Gordon to Ernest R. Field. The letter states that Gordon has met with the partnership's attorney, Glantz. *Id.* Exhibit J. Third, Wagner points to Glantz's deposition, conducted by plaintiffs, in which Glantz admitted receiving his legal fee of twenty thousand dollars from Arlington. *Id.* Exhibit K.

Wagner's argument proves too much. The evidence presented to the court paints a picture of a fluid relationship among Glantz, Wagner, Gordon, and others. It appears, based on the allegations contained in the amended complaint and the criminal indictment of Gordon et al., that Wagner did perform services for Arlington. Whether he is liable to plaintiffs under civil RICO is another matter. *See Sedima, S.P. R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (a "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation"); *Nodine v. Textron, Inc.*, 819 F.2d 347, 349 (1st Cir.1987) (RICO "provides no cause of action to individuals injured by acts other than criminal RICO violations").

Wagner's other basis for requesting sanctions is plaintiffs' refusal to dismiss the action against Wagner for violation of Rule 4(j). As previously discussed, *see supra* at 377, dismissal is not mandated under these circumstances. Therefore, plaintiffs did not act inappropriately in refusing to dismiss the complaint against Wagner.

For these reasons, Wagner's motion for Rule 11 sanctions is denied. This denial is made without prejudice. "To persist in claims ... beyond a point where they can

no longer be considered well grounded violates Rule 11." *Coburn Optical Indus. v. Cilco, Inc.*, 610 F.Supp. 656, 660 (M.D.N.C. 1985); *see Nemeroff v. Abelson*, 620 F.2d 339, 350–51 (2d Cir.1980) (per curiam) (remanding for determination "whether at any point, during the litigation and prior to dismissal, sufficient facts became available to [plaintiffs] to demonstrate that a failure at that point to withdraw the action necessarily amounted to bad faith") (pre–1983 amendment of Rule 11). Plaintiffs are reminded that Rule 11 applies to "[e]very pleading, motion, or other paper."

### CONCLUSION

Defendant Gordon is granted summary judgment on counts one and five. Count three is dismissed with prejudice. Count two is dismissed without prejudice to replead. Count six is dismissed without prejudice to replead as against defendant Wagner.

Judgment will not be entered at this time on counts one and five. The court perceives no hardship or injustice to plaintiffs which would be alleviated by immediate appeal. *See Cullen v. Margiotta*, 618 F.2d 226, 228 (2d Cir.1980) (per curiam).

SO ORDERED.

### SUPPLEMENTAL OPINION AND ORDER

On April 25, 1988, the court issued an Opinion and Order in this action. It appears to the court that clarification of certain issues dealt with in that decision is in order.

First, the lawsuit is timely as against defendant Wagner. The statute of limitations was tolled as against Wagner, as it was against defendant Gordon, until the time plaintiffs obtained constructive knowledge of the probability they had been defrauded, which the court held to be June 13, 1984. *See* April 25, 1988 Opinion and Order at 370. Defendant Wagner is referred to page 377 of the April 25 Opinion

---

**30.** Glantz was named as a defendant in plaintiffs' original complaint. Plaintiffs dismissed the action against Glantz on April 10, 1987.

and Order (stating that because the statute of limitations has not run as against Wagner, it would not be proper to dismiss the action for plaintiffs' failure to comply with Fed.R.Civ.P. 4(j)).

Second, the court did in fact quash service of the complaint against Wagner. Wagner is again referred to page 377 of the April 25 Opinion and Order (stating that, as the action is dismissed as against Wagner for pleading inadequacies, the plaintiffs must properly serve a new summons and the newly amended complaint on Wagner, should they decide to amend their complaint and pursue a remedy against Wagner).

Third, the court intentionally did not establish a time limit on plaintiffs regarding service of an amended complaint. Plaintiffs are free to do so at any time within the remaining statute of limitations period.[1]

Any motion to reconsider or reargue either the April 25, 1988 Opinion and Order or this decision, or both, must be made within ten days from this date.

SO ORDERED.

---

1. Should plaintiffs choose not to allege any cause of action against Wagner, they should nevertheless amend their complaint against Gordon to remedy the deficiencies noted in the April 25 Opinion and Order relating to causes of action against Gordon, if at all, by the time the RICO limitations period lapses.