**131 MAIN STREET ASSOCIATES, et al., Plaintiffs,**

v.

**Bernhard F. MANKO, et al., Defendants.**

**No. 93 Civ. 800(LBS).**

United States District Court, S.D. New York.

Jan. 14, 2002.

Nicholas M. De Feis, De Feis O'Connell & Rose, P.C., New York City, Philip A. Kantor, Law Offices of Philip A. Kantor, P.C., Las Vegas, NV, for Plaintiff.

Stephen E. Kesselman, Brief, Justice, Carmen, Kesselman & Kleiman, LLP, New York City, for Defendant.

## OPINION AND ORDER

SAND, District Judge.

In this long-lived action, Plaintiffs allege civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. While the charged financial chicanery is technical and complex, in essence, Plaintiffs allege that the Defendant Jon Edelman ("Defendant") fraudulently induced Plaintiffs to invest in limited partnership tax shelter investments that Defendant looted by passing off false tax losses and by awarding himself and his co-conspirators commissions and fees for bogus securities trades.[1] *See* Plaintiffs' Memorandum in

---

1. Pursuant to oral argument on December 21, 2000, Plaintiffs voluntarily dismissed their claims, with prejudice, against Defendant Bernhard F. Manko ("Manko") pursuant to a settlement agreement. This motion stands with respect to Defendant Jon Edelman ("Defendant" or "Edelman"). *See* Plaintiffs' Memorandum of Law in Support of Renewed Motion to Amend and for Reconsideration at 1 n. 1 ("Plaintiffs' Memo"). While we pri-

Support of Renewed Motion to Amend and for Reconsideration at 1–2 ("Plaintiffs' Memo"). The specific details of this scheme can be found in *United States v. Manko,* 979 F.2d 900, 901–05 (2d Cir.1992), *cert. denied,* 509 U.S. 903, 113 S.Ct. 2993, 125 L.Ed.2d 687 (1993), and *Greenwald v. Manko,* 840 F.Supp. 198, 199–201 (E.D.N.Y.1993). Plaintiffs present two motions: to amend the amended complaint and to have us reconsider the issue of notice of injury. Defendant's cross motion seeks to dismiss the amended complaint. We reject Plaintiffs' motion and grant summary judgment in favor of the Defendant.

## I. Background

### A. Statement of Facts

At the outset, we outline the structure of the fraudulent scheme, the response of the investors (including Plaintiffs) and Internal Revenue Service ("IRS") to the scheme, and the role of Defendant in planning and carrying out the scheme. Beginning in 1977 Defendant Edelman, along with several others, organized and managed limited partnerships through Arbitrage Management Company ("Arbitrage Management"). *See* Second Amended Complaint (Proposed) at ¶ 37. Plaintiffs were investors in one or more of these limited partnerships, including Government Arbitrage Partnership, The Arbitrage Group, Sectra Limited Partnership, Conarbco, and Midipco (collectively "the partnerships"). Plaintiffs allege Defendants represented to investors that these partnerships would allow investors to obtain tax-advantaged investments, usually through some form of income deferral. *Id.* at ¶ 38. Defendants allegedly represented to Plaintiffs, in order to solicit their

investment, that the partnerships were "profit-motivated, and not risk-free, tax-motivated trades," which otherwise may have violated the various tax laws. *Id.* Defendants also allegedly failed to mention that most of the tax losses passed through to Plaintiffs would be pursuant to fictitious trades, sometimes amounting to billions of dollars, that were devoid of the possibility for profit. *Id.* at ¶ 38, 58. The fictitious trades eliminated any possibility for the investors to achieve economic gain. *Id.* at ¶ 42. Beginning in 1979, defendants allegedly supplied the investment partnerships' outside auditors with incomplete information to prepare the partnerships' tax returns and financial statements for the prior year. *Id.* at ¶ 52. Beginning in 1982, defendants allegedly entered the partnerships into prearranged and bogus repurchase transactions with an inactive corporation controlled by Manko "to purportedly finance certain trades in U.S. Government-backed securities." *Id.* at ¶ 53.

The injuries suffered by Plaintiffs included "the loss of [P]laintiffs' investment; the loss of any profit opportunity on their investment; liability to federal, state and/or local tax authorities; and expenses for the defense of their interests." *Id.* at ¶ 73.

The scheme allegedly operated in the following manner. A trader would purchase a U.S. Treasury Bill on the open market, and to pay for it, the trader would enter into a separate financing transaction called a repurchase agreement with the seller. *Id.* at ¶ 54. This repurchase agreement gives title of the Treasury bill to the borrower; however, the Treasury bill is sold to the lender pursuant to an

marily refer only to Defendant Edelman in this opinion, it is understood that at times the other Defendants named in the complaint

may have worked with Edelman in perpetrating the fraud.

agreement entered into with the borrower to repurchase the bill at a specified time and price.[2] *Id.* When the repurchase agreement's term ends, the borrower pays the lender the agreed upon repurchase price of the Treasury bill, including finance charges. *Id.* at ¶ 55. For the borrower to make a profit, the borrower has to sell the Treasury bill to the lender or on the open market at a sufficiently appreciated price. *Id.* Legitimate traders can take advantage of the tax implications of these transaction. *Id.* at ¶ 56. "By positioning a repurchase agreement to terminate after year end, the borrower's hoped-for profit on final sale of the underlying security can be realized in the following year. However, accrued finance charges up to year end may be accrued for tax purposes as deductible investment interest expense." *Id.* Plaintiffs assert that Defendants' Treasury bill purchases and the attendant repurchase transactions used to finance them were fictitious and illusory. *Id.* at 57. How the Defendants more specifically carried out these transactions can be found in the Second Amended Complaint (Proposed). *Id.* at ¶ 58–81.

In its proposed Second Amended Complaint, Plaintiffs now allege that defendants, including Edelman, engaged in fraudulent concealment of the scheme. *Id.* at ¶ 82. Defendants maintained a trading room to give the appearance of a legitimate government securities dealer. *Id.* at ¶ 83. Legitimate traders conducted regular and legitimate transactions with well-known securities, and when the defendants conducted bogus trades, only a small group of traders was used and the transaction was kept secret from the legitimate traders. *Id.* Defendants further told their accounting staff that the bogus trades were bona fide and at arms length. *Id.* at

¶ 86. Defendants used an organization of its creation, T.S.M. Holding Corp. (TSM), with which to trade, and the paperwork generated by TSM led the auditors to believe that "they had confirmed trades done between defendants and TSM, and that such trades were *bona fide* and at arms length." *Id.* at ¶ 87.

From the beginning of the investment partnership until February 18, 1988, the limited partner investors, including Plaintiffs, allegedly sought to monitor the integrity of the defendants' operations "by establishing an infrastructure of investor and administrative services representatives to serve as intermediaries between investors and the general partners and as paid 'watchdogs' or 'snoops' ...." *Id.* at ¶ 89. These representatives included Barry Lyman and the accounting firm Berk & Michaels. *Id.* Defendants, however, allegedly engaged in acts designed to throw the watchdogs off the trail, including giving the watchdogs trading documents showing trades with recognizable securities firms but never with TSM. *Id.* at ¶ 90. According to Plaintiffs, Lyman represented not just the investors that he put into the deal, but all investors. *Id.* at ¶ 92. Moreover, the IRS investigated the partnerships throughout the 1980s, and Plaintiffs were sent (a) copies of the reports and (b) the response of Defendant and its counsel to such reports. *See, e.g., Kesselman Aff.* Ex. 5 (1985 IRS Report of The Arbitrage Group), Ex. 6 (1988 IRS Report of Conarbco), Ex. 7 (1988 IRS Report of Midopco), Ex. 7 (1987 IRS Report of Sectra Limited). In response to the IRS challenge to the partnerships' tax position, Defendants hired the law firm Saltzman & Holloran "to defend the investment partnerships' federal tax position."[3] Second Amended Complaint (Proposed) at ¶ 94.

---

2. The repurchase agreement provides for either a fixed or fluctuating borrowing rate.

3. Simon Jacobson was hired to represent the partnerships' New York State tax position,

Plaintiffs allege that Defendants prevented them from learning of the fraud. For instance, on May 7, 1986, Edelman wrote to the partners of Midopco that the losses facing the partnerships were the result of accounting errors by the IRS. *Id.* at ¶ 96. Lyman and Berk & Michaels' investigation into the Defendants' operations revealed (a) high commissions and (b) high overhead. *Id.* at ¶ 97. Defendants offered a reasonable explanation for the cost of commission and overhead——an explanation that did not reveal that the commissions were for bogus securities trades. *Id.* at ¶ 99. Moreover, a number of outside auditors certified the partnerships' accounts (e.g., those of Sectra, Midopco, Conarbco) because the auditors had not been told that TSM was not an independent entity trading at arms length with defendants. *Id.*

Plaintiffs' also allege that their failure to attribute their tax-related losses to Defendants' scheme was not due to their own lack of reasonable diligence. *Id.* at ¶ 106. Defendants encouraged the limited partners to retain the firms already hired by management, and about 150 of them did so. *Id.* Defendants point out that the IRS summary reports issued in the 1980s contained several errors indicating that the preliminary disallowance of partnership items could be successfully defended. *Id.* at ¶ 107. Defendants allegedly hid from Plaintiffs the trading with TSM and asserted primary control over the response to the tax audits, pushing for their early resolution. *Id.* at ¶ 109. Some time in late 1987 to early 1988, an agreement was reached to settle the audits. *Id.* at ¶ 110.

On February 8, 1989 Edelman and Manko were indicted on charges of "conspiracy to commit tax fraud, subscription to knowingly false tax returns, and of aiding and abetting the (unwitting) filing of false tax returns by limited partnership investors such as [P]laintiffs." *Id.* at ¶ 43. Both were convicted on all counts in the indictment, and the convictions have been affirmed on appeal. *See United States v. Manko,* 979 F.2d 900 (2d Cir.1992). On February 8, 1993, Plaintiffs brought suit against Defendants, exactly four years after the 1989 indictment. Plaintiffs allege civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et. seq.

### B. Procedural History

This Court's February 28, 2001 Memorandum and Order serves as the procedural backdrop for the Plaintiffs' current motion to amend the amended complaint and for reconsideration of the notice of injury issue and for Defendant's cross-motion to dismiss the amended complaint. *See 131 Main Street v. Manko,* 2001 WL 199424 (Memorandum and Order, February 28, 2001) (*"Feb.2001 Order"*). There, we readdressed the question of timeliness after the United States Supreme Court in *Rotella* held that the *Malley–Duff* four-year statute of limitations period begins as soon as a plaintiff discovers his injury, regardless of when the fraud causing that injury is discovered. *Id.* at 2; *Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000); *Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987).[4]

---

and in 1986 Miller & Chevalier was also hired by Defendants to present the partnerships' tax position. Second Amended Complaint (Proposed) at ¶ 94.

**4.** Prior to the Supreme Court's clarification of the statute of limitations issue in *Rotella,* we

found that Plaintiffs' RICO claims, initiated on February 8, 1993, would be barred if Plaintiffs had learned of both their own injuries and Defendants' fraud prior to February 8, 1989. *131 Main Street v. Manko,* 897 F.Supp. 1507, 1514–15 (S.D.N.Y.1995). We

Thus, because Plaintiffs filed the RICO action on February 8, 1993 and knew of the injury before February 8, 1989, we held that the Plaintiffs' RICO action was barred by the statute of limitations. *Feb. 2001 Order* at 2.

However, in our *Feb. 2001 Order* we acknowledged the significance of Plaintiffs' argument that the doctrine of equitable tolling could preclude summary judgment of the RICO claim. *Id.* at 3. We noted that the motion for summary judgment and amending the amended complaint hinged on the viability of Plaintiffs' new fraudulent concealment claim.[5] *Id.* The inquiry is straightforward: "If the unchallenged facts of this case contradict any of the [ ] three elements [of fraudulent concealment] as a matter of law, Plaintiffs' RICO action will be barred and any amendment of the pleadings will be futile." *Id.* at 4. After briefing and oral argument, we were not prepared at that time to

answer this question because of several outstanding factual issues that needed to be developed by the parties. Specifically, we directed the parties to engage in limited fact discovery to determine (1) whether Plaintiffs had a watchdog at all times prior to February 8, 1989, and what bearing this would have on the due diligence requirement, and (2) whether Barry Lyman,[6] while serving as a watchdog for Plaintiffs, was aware of Defendant's fraud more than four years prior to the commencement of this suit, and what bearing this would have on the ignorance requirement. *Id.* at 4–5.

We now rule on these motions.

## II. Discussion

### A. Motion to Amend Complaint and Motion for Summary Judgment

 Leave to file an amended complaint "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Unless there is evidence of undue delay, bad faith,

---

found that while Plaintiffs had notice of their injuries before February 8, 1989, we also found that there existed a genuine issue of material fact as to the date by which Plaintiffs had inquiry notice of Defendants' fraud. *Id.* Since 1995, the record has been more fully developed with regard to the issue of Plaintiffs' awareness of Defendant's possible fraud. For instance, Barry Lyman's knowledge of the fraud is imputed to Plaintiffs, as will be discussed herein.

5. If a proposed amendment serves no useful purpose, then it is futile and leave to amend will be denied if the proposed amended complaint could not survive a summary judgment motion. *See Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir.2001).

6. There is no dispute that Lyman's knowledge, if any, of the fraud would be imputed to Plaintiffs. The Plaintiffs claim that Lyman served, from the inception of the investment partnerships until February 18, 1988, as a paid "watchdog" whose job it was to "monitor the integrity of the defendants' operations." Plaintiff's Second Amended Complaint (Proposed), ¶ 89.

We note the incongruity in Plaintiffs use of Barry Lyman at this stage of the proceeding in order to fulfill the due diligence element of fraudulent concealment. As of our 1995 opinion in this matter, Lyman was a defendant and it was alleged that he " 'knowingly participated in and aided and abetted the [fraudulent] plan and scheme by marketing the limited partnership interests to plaintiffs and other investors in the investment partnerships ... and by acting as placement agent and underwriters for the investment partnerships.' " *See 131 Main Street Assoc.*, 897 F.Supp. at 1531 (citations omitted). Now, Lyman is no longer a defendant, and in order to fulfill the due diligence requirement, Plaintiffs have wholeheartedly adopted him as their watchdog. However, if Lyman was not ignorant of the scheme while he was their watchdog, the statute of limitations cannot be tolled. We reject Plaintiffs' view at oral argument that they can adopt Lyman as their agent for only limited purposes (i.e., for the due diligence element but not the ignorance of the claim element). *See* December 21, 2000 Transcript at 21–22.

undue prejudice to the non-movant, or futility, leave to file an amended complaint should not be denied. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).[7] If the Plaintiffs' proposed amended complaint is futile, then the motion for leave to amend will be denied, which will have the effect of a grant of summary judgment in favor of the Defendant. *See Feb. 28, 2001 Order* at 3 n. 2.

■ *Rotella* states that the *Malley–Duff* four-year statute of limitations period begins when a plaintiff discovers his injury.[8] *Rotella*, 528 U.S. at 555–56, 120 S.Ct. 1075. However, the Plaintiffs may avail themselves of the doctrine of equitable tolling if they can show that the elements of fraudulent concealment have been met. *Id.* at 560–61, 120 S.Ct. 1075. *See, e.g., In re Merrill Lynch Limited Partnerships Litigation*, 154 F.3d 56, 60 (2d Cir.1998); *DLT Resources, Inc., v. Credit Lyonnais Rouse, Ltd.*, 2001 WL 25695 (S.D.N.Y.2001). We reject Defendant's argument that the statute of limitations can be tolled only if Defendant concealed the injury without regard to whether the fraud was concealed. *See* Defendant's Memorandum of Law at 6 ("Defendant's Memo"). The Court in *Rotella* noted that "[i]n rejecting pattern discovery as a basic rule, we do not unsettle the understanding that federal statutes of limitations are generally subject to equitable principles of tolling, and *where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it, equitable tolling may be one answer to*

*the plaintiff's difficulty ....*" *Id.* (citations omitted) (emphasis added). Equitable tolling is "the exception, not the rule." *Id.*

If Plaintiffs can satisfy the elements of fraudulent concealment, then the statute of limitations may be tolled and Plaintiffs may be able to amend the amended complaint in order to add specific allegations of fraudulent concealment. We turn to the elements of fraudulent concealment:

> [A] plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations if he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to a lack of diligence on his part.

*State of New York v. Hendrickson Brothers, Inc.*, 840 F.2d 1065 (2d Cir.1988) *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988). The purpose of this doctrine "is to prevent a defendant from 'concealing a fraud, or ... committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it.'" *Hendrickson Bros.*, 840 F.2d at 1083 (*quoting Bailey v. Glover*, 21 Wall. 342, 88 U.S. 342, 349, 22 L.Ed. 636 (1874)). Thus, the application of fraudulent concealment provides qualifying plaintiffs some relief from *Rotella's* more stringent injury-discovery rule.[9]

---

7. This Court may consider the proposed amended complaint in determining whether Plaintiffs have adequately pleaded its claim and whether sufficient facts exist to support such claims in order to defeat summary judgment. *See Milanese v. Rust–Oleum Corp.*, 244 F.3d 104, 110 (2d Cir.2001).

8. In *Malley–Duff*, the Supreme Court established a four-year limitations period for civil

RICO claims. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987).

9. However, the "burden rests squarely on the party pleading fraudulent concealment, ... and courts require particularity in pleading fraudulent concealment." *Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423, 1443 (S.D.N.Y.1986).

### 1. Element 1: Concealment of the Cause of Action

█ The Plaintiffs may prove the concealment element in one of two ways: (a) the Defendant took affirmative steps to prevent the Plaintiffs from discovering the claim or injury, or (b) the wrong itself was of such a nature as to be self-concealing. *See Hendrickson Bros.,* 840 F.2d at 1083; *see also In re Nine West Shoes Antitrust Litigation,* 80 F.Supp.2d 181, 192 (S.D.N.Y.2000) ("Our Circuit has adopted the more lenient standard requiring plaintiffs to prove concealment by showing either that the defendants took affirmative steps to prevent plaintiffs' discovery of the conspiracy, or that the conspiracy itself was inherently self-concealing.").

Defendant relies on an opinion rendered in a related Vermont Bankruptcy Court case. *In re Bushnell,* 271 B.R. 54 (Bankr. D.Vt.2001) (Ex. 3 to Kesselman Aff.). In that case, the Bankruptcy Judge held that the defendant Robert Bushnell did nothing affirmatively to cover up the fraud and that the scheme was not self-concealing. *See* Defendant's Memo at 22. We decline to make a similar finding.[10] Instead, we find there is sufficient evidence to show that Defendant engaged in a number of affirmative acts designed to conceal and obfuscate the scheme that are separate and distinct from the original scheme itself.

█ We find that two pieces of evidence create enough of a factual question as to whether the Defendant affirmatively attempted to cover up the initial conspiracy to defraud investors through these partnerships.

First, in the immediate aftermath of the IRS audit reports, Defendant brought in Saltzman & Holloran to address the reports. Plaintiffs allege that Defendant misled the counsel into finding no wrongdoing and further caused the counsel to complete the audit quickly so that suspicions would not be raised. *See* Second Amended Complaint (Proposed) at ¶¶ 109–111. Other than vague accusations by Barry Lyman, Plaintiffs' watchdog, we have little evidence to support the theory that the Defendant affirmatively misled counsel. *See* Lyman July 19, 2000 Aff. However, at the very least, Defendant permitted the counsel to make representations to the Plaintiffs and their agents that gave the impression that Defendant's business was legitimate and that the IRS had merely made factual errors in its audit. *See, e.g.,* Waschitz Aff. at ¶ 3–5. In bringing in counsel and permitting these representations to be made to Plaintiffs, the Defendant was acting to cover up the initial conspiracy to defraud investors.

Moreover, as the IRS issued its audit reports throughout the 1980s, Defendant personally sent a number of letters to the partnership. For instance, in 1987 Defendant responded to the IRS audit activity with a letter to the limited partners indicating that Defendant's counsel believes "that there is some reasonable prospect of success in the event of a litigation." *See* Kantor Aff. Ex. L; *see also* Kesselman Aff., Ex. 6–7; Peluso Aff., Ex. C (Edelman March 15, 1984 Letter to limited partners); Ex. D (Edelman June 3, 1985 Letter to limited partners); Ex. F. (Edelman 1986 Letter to limited partners). Together, these letters may have been intended to give the Plaintiffs some peace of mind that

---

10. It should be noted that in its evaluation of the existence of self-concealing fraud, the Vermont Bankruptcy Court considered that the plaintiff provided no evidence that defendant (*not* Edelman) "participated in or concealed the RICO cause of action." *See In re Bushnell,* 271 B.R. 54, 60 (Bankr.D.Vt.2001) (Ex. 3 to Kesselman Aff.). In this case, however, it is alleged that Defendant participated in both the fraud and the fraudulent concealment.

the Defendant and the counsel were adequately addressing all of the allegations of the IRS audit reports. We now know that was not the case—the Defendant knew that the counsel was not investigating the most alarming of the IRS allegations, namely Defendant's fraud. Defendant's letters to the Plaintiffs give the impression that the counsel was being provided with all of the necessary information to address the IRS allegations.

Because we find that Defendant made affirmative acts in concealing the fraud separate from the fraud itself, or at least that a question of fact exists, we do not determine whether the fraud in this case can be regarded as self-concealing.[11]

### 2. Elements 2 & 3: Ignorance of the Cause of Action Within Four Years of the Filing of the Complaint and the Exercise of Due Diligence [12]

■ The purpose of the second and third elements relate "to whether the plaintiff had sufficient information to commence an action at an earlier point." *State of New York v. Cedar Park Concrete Corp.*, 684 F.Supp. 1229, 1232 (S.D.N.Y. 1988). The second element of fraudulent concealment states that the plaintiff must be ignorant of the cause of action. Knowledge of the cause of action is not necessary. Notice of a potential claim is all that is necessary:

> The doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on

notice of a potential claim. A key aspect of a plaintiff's case alleging fraudulent concealment is therefore proof that the plaintiff was not previously on notice of the claim he now brings.

*United States v. Incorporated Village of Island Park*, 791 F.Supp. 354 (E.D.N.Y. 1992) (*citing Hobson v. Wilson*, 737 F.2d 1, 35 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985)). Moreover, one district court stated "[a]ll that is necessary to cause the tolling period to cease is for there to be reason to suspect the probability of any manner of wrongdoing." *Zola v. Gordon*, 685 F.Supp. 354, 367 (S.D.N.Y.1988). *See also Donahue v. Pendleton Woolen Mills*, 633 F.Supp. 1423, 1444 (S.D.N.Y.1986) (equating suspicion with knowledge in the context of fraudulent concealment); *In re Sumitomo Copper Litigation*, 104 F.Supp.2d 314, 323–24 (S.D.N.Y.2000) (suggesting only inquiry notice is necessary to start the running of the statute of limitations). *But see Philip Morris Inc. v. Heinrich*, 1997 WL 781907, *5 (S.D.N.Y. 1997) (indicating that actual knowledge is necessary). Similarly, the Second Circuit Court of Appeals found no error where, in a case alleging fraudulent concealment, "[t]he [district] court also told the jury that the State had not met its burden [of proving grounds for tolling the statute of limitations] if it had a suspicion of collusive bidding on a single contract or any other information that should have alerted it to its claim of an overall conspiracy." *Hendrickson*, 840 F.2d at 1085.

---

11. While this Court acknowledges the strength of Plaintiffs self-concealing fraud argument, there is more than sufficient evidence to find affirmative acts, thus obviating the need to go down the murky road of deciding what constitutes self-concealing fraud. *See, e.g., Butala v. Agashiwala*, 1997 WL 79845 (S.D.N.Y.1997).

12. We address the second and third elements together because, in this case, they are often related. Specifically, whether the Plaintiffs were ignorant of the cause of action is in some instances directly related to whether the cause of action was not discovered earlier despite the Plaintiffs' due diligence.

The third element necessary to toll the statute of limitations is that the plaintiff must have exercised reasonable diligence. While the question of whether a plaintiff exercised reasonable diligence is frequently a question of fact to be decided by a jury, the issue may be decided on summary judgment if the facts in the record are clear and sufficient. *See Dietrich v. Bauer*, 76 F.Supp.2d 312, 345 (S.D.N.Y. 1999); *In re Sumitomo Copper Litigation*, 104 F.Supp.2d 314, 324 (S.D.N.Y.2000); *see also Salinger v. Projectavision, Inc.*, 934 F.Supp. 1402, 1408 (S.D.N.Y.1996) ("The question of constructive knowledge and inquiry notice may be one for the trier of fact and therefore ill-suited for determination on a motion to dismiss .... Nonetheless, the test is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from pleadings and the public disclosures themselves."); *In re Merrill Lynch Ltd. Partnerships Litigation*, 154 F.3d 56 (2d Cir.1998) (holding that the question of inquiry notice need not be left to a finder of fact). Moreover, in the RICO context, the purpose of private civil actions is to compensate victims and to "encourage those victims themselves diligently to investigate and thereby to uncover unlawful activity." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997).

In our Feb. 2001 Order, we asked the parties to brief two factual issues that we now find dispositive of this case.

### a. *Watchdog Prior to 1989*

The first inquiry presented by our Feb. 2001 Order is whether there was a gap in Plaintiffs' exercise of due diligence at any point up to February 8, 1989, and whether such a gap would constitute a failure to exercise due diligence. On February 18, 1988, Barry Lyman, plaintiff's watchdog, wrote a letter to Defendant Edelman acknowledging his termination as a watchdog. For purposes of these motions, we assume that letter did in fact terminate Lyman's employment as a watchdog on that date. *See* Lyman Letter Feb. 18, 1988 (Ex. A. to Kantor Aff.). Thus, Lyman's knowledge of the fraud obtained after he was terminated as watchdog and began cooperating with the government investigation will not be imputed to Plaintiffs.

The question, then, is whether any watchdog existed from the date of Lyman's termination until February 8, 1989, the date on which the statute of limitations commenced. If no watchdog existed during this time, then Plaintiffs may not be able to satisfy the due diligence requirement.

First, Berk & Michaels, an accounting firm, ceased monitoring the operations on behalf of investors after Arbitrage Management began to wind up business some time in late 1997 and early 1988. *See* Lyman May 10, 2001 Aff.; *see also* Edelman Dec. 15, 1987 Letter (Ex. L to Kantor Aff.). Moreover, from at least February 1988 to February 1989, the partnerships' legal representation was no longer investigating the allegations of the IRS but instead defending against the IRS accusations. The management of the partnership retained the law firm Saltzman & Holloran to defend the partnership against the IRS inquiries.[13] *See 131 Main Street Assoc.*, 897 F.Supp. at 1519. Plaintiffs repeatedly refer to this law firm as "independent counsel," but it is clear from the record that Saltzman & Holloran was retained to defend the

---

13. The Plaintiffs claim that two other law firms were retained by the partnership, but the details of their activity is not apparent from the record.

partnership as opposed to investigate any wrongdoing by Defendant. *See, e.g.,* Washitz Aff. ¶ 5; Second Amended Complaint (Proposed) ¶ 94. There is no evidence that any counsel of the management or of Plaintiffs investigated the Defendant's possible wrongdoing; instead, counsel only defended the partnerships against the IRS allegations after the audit committee, which included Lyman, concluded early on that it would fight the IRS reports. *See, e.g.,* Lyman July 19, 2000 Aff. at ¶¶ 8–13.

Thus, from February 18, 1988, the date Lyman's role as watchdog ended, until February 8, 1989, the date of Defendant's indictment and the commencement of the statute of limitations, there was no watchdog or due diligence performed by Plaintiffs or their agents.

Plaintiffs rightly point out that "[t]he law does not require a plaintiff to demonstrate some sort of investigative activity for every minute of the time period up to the statute of limitations date . . . ." *See* Plaintiffs' Memo at 13. No case we found has such a requirement and Defendant does not dispute this proposition. Plaintiffs seem to concede that no official watchdog of Lyman's ilk existed from the date of Lyman's termination to the indictment date of February 8, 1989 because "the issue of improper trading was dealt with quickly, decisively and reasonably, and then concluded." *Id.* at 14.

■ This would not be a problem for the Plaintiffs if the dispute with the IRS had been finally settled before February 18, 1988. However, it was not. On April 29, 1988 the IRS issued an audit report of Conarbco that presented what should have been alarming statements regarding the company.[14] This letter came to Plaintiffs *after* a protest letter by Saltzman & Holloran dated on August 7, 1987.[15] *See* December 12, 2000 Letter, Ex. B; Washitz Aff. at 2 (Ex. B to Kantor Aff.). Thus, even if the IRS had made factual errors in the initial report, or if Plaintiffs and their agents characterized the initial report as a blunderbuss accusation, *the IRS had not altered its conclusions* that transactions did not actually take place despite the protestation of the Plaintiffs' attorneys. The Plaintiffs themselves not only failed to respond personally to this challenge to their factual and legal arguments, but they failed to hire a new watchdog or any other expert to investigate whether the new report represented an additional cause of concern. Perhaps if they had been more diligent during this period, Plaintiffs would have learned of the criminal investigation

---

14. The April 29, 1988 audit report includes the following conclusions:

> In addition it appears that all the interest that Conarbco purports to have paid or received was never paid or received. They appear to have been merely a bookkeeping entry made on Conarbco's books. Further, beyond a paper confirmation from another, related, partnership (Government Clearing Company) there is no evidence whatsoever that these securities ever were owned by Conarbco. There is no record on the Federal Wire or through the clearing bank that the underlying securities were ever owned by or transferred to Conarbco. The partnership's only documentation is internally

> generated confirmations between commonly controlled partnerships. . . .
> The information received does not establish that the transactions actually occurred. In addition, even if they did occur, the information presented fails to establish that the transactions were not prearranged or that they were genuine, or that they occasioned a real change in economic position.

IRS Audit Report April 29, 1988, at 4 (Ex. 6 to Kesselman Aff.).

15. The protest letter points out factual errors in the IRS report. For instance, the IRS failed to realize the Government Clearing Company was part of the Arbitrage Management group. *See* Dec. 12, 2000 Letter, Ex. B, at 5–6.

of Defendant. Plaintiffs may have realized that the refusal of the IRS to settle the matter quickly signaled that the IRS had not merely made a few factual errors in its report. From February 1988 to February 1989, there is no evidence that the lawyers representing the partnerships actively investigated the content of the IRS reports claiming that the financial transactions never took place. Instead, the lawyers concentrated solely on defending the partnership with the information given to them by the Defendant. Thus, the Plaintiffs failed to exercise reasonable diligence after Lyman's role as watchdog was terminated in 1988 and when the indictment of the Defendant triggered the statute of limitations in 1989.

We do not rule on whether the actual pre-February 18, 1988 investigation conducted by Plaintiffs (including Lyman) was reasonable because we conclude that, in any event, Plaintiffs failed to perform due diligence from 1988 to 1989. We find that a question of fact exists as to whether the pre–1988 investigation of the IRS claims was reasonable. Defendant offers affidavits from Michael Slonim, V. Jean Owens, Alan J. Dlugash, John F. Kelley, and Michael Washitz. *See* Washitz Aff. (Ex. B to Kantor Aff.); Slonim Aff. (Ex. C to Kantor

Aff.); Dlugash Aff., Kelley Aff., Owens Aff. (Ex. A to Dec. 12, 2000 Letter). Together, these expert witnesses and paid consultants of Defendant argue that the IRS reports should not have evoked a more forceful reaction and investigation from Plaintiffs. For instance, the findings of the IRS Reports were characterized as being "routine" in this type of investment. *See* Slonim Aff. at 2 (Ex. C to Kantor Aff.). While we do not believe that allegations of fraud in an IRS report should have been handled as a routine matter, these questions would be more appropriately reserved for the trier of fact.[16]

b. *Lyman's Alleged Ignorance as Watchdog and Exercise of Due Diligence*

Even if we assume that the investigation conducted prior to the February 18, 1988 termination of Lyman's watchdog status was adequate and rendered unnecessary any investigation into IRS reports after his termination, Plaintiffs cannot show their ignorance of the cause of action prior to February 8, 1989, the date of the Defendant's criminal indictment and commencement of the statute of limitations.

As noted, in order to satisfy the second prong of a fraudulent concealment claim,

16. However, we do note that the investigation performed prior to February 18, 1988 was rife with inadequacies. For instance, there is no evidence explaining the actions taken by Saltzman & Holloran to investigate the IRS claim that the transactions never took place. There is no evidence in the record that Plaintiffs even once asked the IRS to expand on its conclusion that the transactions did not actually occur. *See, e.g., Zola,* 685 F.Supp. at 366 (finding a lack of diligence where investors presumed the IRS had not taken certain circumstance into account and where investors chose not to make any inquiry of the IRS). Plaintiffs cannot hide behind the fact that counsel merely assured them that the transactions did in fact take place. *See, e.g., In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,* 815

F.Supp. 620, 640 (S.D.N.Y.1993) ("[O]nce placed on inquiry notice, a limited partner cannot avoid the duty to inquire by relying on reassurances and optimistic statements made by the partnership."); *Farr v. Shearson Lehman Hutton, Inc.,* 755 F.Supp. 1219, 1228 (S.D.N.Y.1991) ("[T]hese statements of cautious optimism, reiterations of the goal of providing income to investors, and explanations for past poor performance do not rise to the level of affirmative concealment necessary to excuse a reasonable investor from the duty of inquiry presented by the cold numbers contained in the [reports]"). Since the counsel were brought in by the management, there would be a good argument that Plaintiffs could not merely rely on counsel's representations without doing any investigation on their own.

Plaintiffs must prove that they were ignorant of the fraud within four years of the commencement of the action. Defendant asserts that Plaintiffs' watchdog Barry Lyman was aware of the fraud before February 8, 1989 while Lyman was still serving in his watchdog capacity. The inquiry is straightforward and familiar: What did Lyman know, and when did he know it?

In our Feb. 2001 Order, we were concerned about Lyman's ostensibly contradictory statements regarding the time he first became aware of Defendants' illegal scheme. Lyman states in his September 29, 1994 affidavit that "I *first became aware* of the misconduct and fictitious trading by Manko and Edelman when I received ... notices of disallowance and other audit reports" from the IRS in 1985 and 1986. Lyman Sept. 29, 1994 Aff. ¶¶ 3–4 (emphasis added). However, in his July 19, 2000 affidavit, Lyman states that "I *did not actually know* about Manko's and Edelman's misconduct and fictitious trading activity until I began cooperating with the government's criminal investigation of them just prior to indictment" on February 8, 1989. Lyman July 19, 2000 Aff. ¶ 7 (emphasis added). In response to our request for clarification on this striking about-face, Lyman states in his May 10, 2001 affidavit that he did not learn about Defendant's fraud "prior to the time my role as an investor services representative ended." Lyman May 10, 2001 Aff. ¶ 2. Moreover, he states that he "learned for the first time facts establishing the fraud perpetrated by Manko and Edelman, in or about July 1988" when he began to cooperate with the U.S. Attorney's Office. *Id.* Lyman further attempts to rehabilitate his

testimony by stating that he was only "aware" of the Defendants' misconduct in the sense that he was "suspicious" when he received the IRS reports, and it was not until he began cooperating with the government in 1988 that he came to "actually know" that those suspicions were true. *Id.* at ¶ 12.

 The facts surrounding Lyman's role as watchdog and Lyman's own statements, including his most recent attempts at clarifying his testimony, prevent Plaintiffs from satisfying the second element of the fraudulent concealment claim.[17]

Lyman's July 19, 2000 affidavit does little to help Plaintiffs invocation of equitable tolling. Lyman states that the reports in fact put him on "alert." Lyman July 19, 2000 Aff. ¶ 9. Further, Lyman's most recent affidavit does little to support his lack of ignorance of the cause of action prior to his termination as watchdog. Lyman states, "I became suspicious (hence 'aware') of Manko's and Edelman's fraud when I received the IRS reports. I came to 'actually know' that those suspicions were true when I began cooperating with the government's investigation." Lyman May 10, 2001 Aff. ¶ 12. Plaintiffs would have us adopt the rule that actual knowledge of the claim is necessary to bar the tolling of the statute of limitations. *See* Plaintiffs' Reply Memorandum at 4–5. However, as already noted, all that is necessary is that Plaintiffs have some suspicion of the fraud. *See, e.g., Zola,* 685 F.Supp. at 367. Lyman's suspicion was not merely a passing thought, routine occurrence, or product of an overly anxious investor. He states in his most recent affidavit that, "[i]n particular, I considered

---

17. In coming to this conclusion, we are not persuaded by Defendant's claim that Lyman's testimony in Defendant's criminal trial indicates that Lyman was aware of the fraud prior to 1988. *See* Kesselman Aff., Ex. 11, at 2. In that trial, Lyman stated that some time

in the early 1980s, Manko told him the trades would be difficult to trace. *Id.* That Lyman knew the trades would be difficult to trace is not proof that he was suspicious the Defendants were engaged in a fraudulent scheme.

then (and still do now) that the IRS reports contained very disturbing and alarming accusations of trading by the partnerships that placed all investors—myself and plaintiffs included—on inquiry notice of the sort of fraud alleged in the complaint against me. I became suspicious (hence "aware") of Manko's and Edelman's fraud when I received the IRS reports." Lyman Aff. May 10, 2001 ¶ 12. He was not merely aware that something was amiss, but he was aware of and suspicious of the activities of Defendant.

The IRS reports themselves reinforce the validity and seriousness of Lyman's suspicions. The contested interpretations from Lyman's sworn testimony primarily involve a number of IRS Reports, beginning in 1985, of The Arbitrage Group, Conarbco, Sectra, and Midopco.[18]

Consistent with these IRS report, Lyman states in his September 29, 1994 affidavit:

> I firmly believe that the earliest IRS notices (i.e., those in 1985 and 1986) that

18. For instance, in the March 21, 1985 audit report for The Arbitrage Group provides, in relevant part:

> The part of the scheme involves the purchase and sale of the security on the same day. Therefore the taxpayer maintains that no substantial outlay of funds is necessary. It is important to note that in this transaction and in all other transactions there is no evidence to verify that G.A.C. or in subsequent years, G.C.C, ever owned the securities in which these trades were purported to have been made. Also, actual money changed hands only on rare occasions. Almost all transactions were merely a debit or credit to the account balance of G.A.C. or G.C.C....
>
> Again, the most important point is that there is no evidence that the partnership TAG or the clearing companies G.A.C. or G.C.C. ever owned these securities....
>
> Another important point is that the millions of dollars in interest that TAG purports to have paid or received was never actually paid. It was merely a bookkeeping entry made on the books of T.A.G. and G.A.C. or G.C.C. No actual payments of these amounts were ever paid or received....
>
> The most important point is that beyond a paper confirmation from another partnership, G.A.C. or G.C.C., there is no evidence whatsoever that these securities ever were owned by T.A.G. Even the certified audit merely verified the fact that G.A.C. or G.C.C. (partnerships controlled by the same general partners) was purporting to be holding these securities....
>
> There is no record on the Federal Wire or through the clearing bank that the underlying securities were ever owned by or trans-

> ferred to or from T.A.G., G.A.C. or G.C.C. The partnerships only documentation is internally generated confirmations between commonly controlled partnerships.
>
> The huge amounts of interest income and expense were merely handled as a debit or credit on the books of T.A.G. G.A.C. and G.C.C. These amounts were never actually paid.
>
> It is the practice in the industry for repurchase agreements to be short-term instruments usually lasting only a few days but the purported repurchase agreements in this case were always much longer, 2 months, 3 months, 6 months or more. The purpose of a repurchase agreement is that when a company has excess funds for a few days they wish to invest they can invest them with little risk by entering a repurchase agreement. If a company wanted to tie up their funds for a longer period of time they could buy the government security itself.
>
> The partnership has given no credible explanation for their dealings in these securities....
>
> The information presented to date does not establish that the transactions reported ever occurred, much less that they occurred as reported. In addition even if something did occur, the information fails to establish that the transactions were not prearranged, or that they were genuine or that they occasioned a real change in economic position.

See 1985 IRS Report of The Arbitrage Group (Ex. 5 to Kesselman Aff.) (minor punctuation added). Similar reports were issued by the IRS in an April 29, 1988 audit report of Conarbco and an April 19, 1988 IRS report of Midopco. See Kesselman Aff., Ex. 6–7.

the other defendants previously submitted to the Court placed all investors on notice of the possibility (which proved to be the reality) that Manko and Edelman had engaged in phony trading activities. The subsequent IRS notices in 1987 and 1988, which are annexed hereto, left no doubt whatsoever that Manko and Edelman had not actually performed the trading they said they did, but instead had deceived me and the other investors. Thus, all investors clearly knew long before February 8, 1989 (i.e., more than 4 years before plaintiffs brought suit) of the fraudulent trading activities by Manko and Edelman.

Lyman Sept. 29, 1994 Aff. ¶ 6.

Lyman states that the warning that he received from the IRS reports was quelled by the assurances from counsel such as Saltzman & Holloran. *See id.* at ¶ 6. Once on alert and suspicious of Defendant's activities, though, the tolling of the statute of limitations is barred. The law of fraudulent concealment clearly states that the plaintiff must be ignorant of the cause of action——the cause of action being the conspiracy to defraud investors and loot the partnerships. Lyman's own statements in his affidavits and the IRS reports in front of him will not permit a conclusion that Lyman was ignorant of Defendant's fraud. He did not need to know to a certainty the specific details of the scheme. As a consequence of our previous finding that Plaintiffs knew of their injury before February 8, 1989 and our current finding that Plaintiffs, through their agent Lyman, were not ignorant of the fraud before that same date, we find that Plaintiffs waited too long to bring this action because the statute of limitations began running some time well before 1989.

## B. Motion for Reconsideration of Plaintiffs' Notice of Injury

Plaintiffs further request that we reconsider our 1995 summary judgment holding that Plaintiffs had notice of their injury prior to February 8, 1989. We assume familiarity with our 1995 holding. *See 131 Main Street Assoc. v. Manko,* 897 F.Supp. 1507 (S.D.N.Y.1995). In our 1995 opinion, we acknowledged three types of injuries: "liability to federal, state and/or local tax authorities; expenses incurred in defending themselves against challenges to their tax filings; and the depletion of the financial base of the tax-shelter investments themselves." *Id.* at 1515, 1517–18. However, the Plaintiffs, in their request for reconsideration of the notice of injury issue, only discuss their tax-related injuries. Similarly, we limit our discussion to the Plaintiffs' tax-related injuries.[19]

In 1995, "we conclude[d] that plaintiffs' tax-related injuries occurred prior to February 8, 1989, and that plaintiffs had actual knowledge of those injuries prior to that date." *Id.* at 1517. We made this finding based on several pieces of evidence. From 1985 through 1988, Plaintiffs had access to the IRS notices of tax disallowances. *Id.* at 1515. By late December 1987, the IRS and counsel for the partners of the limited partnerships worked out a global settlement, which included a formula by which all investors could calculate their penalties. *Id.* at 1516. A number of partners accepted the terms of the settlement in January 1988. *Id.*

Plaintiffs argue that we reconsider the reach of the that holding to distinguish those investors who accepted the settle-

---

**19.** However, we would find nothing in the record to warrant reversal of our position on the other two injuries.

ment-in-principle from those who did not accept. *See* Plaintiffs' Brief at 20.

 As we noted in 1995, the law did not require that "a potential plaintiff must be able to calculate his loss down to the last penny before his RICO injury can be said to exist; all that is required is that the injury not be 'speculative.'" *131 Main Street Assoc.*, 897 F.Supp. at 1517 (*citing Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir.1988)). We further noted that "[a]s a result of the December 1987 accord with the IRS, plaintiffs' injuries were ascertainable; indeed, they had in hand an agreed-upon formula for calculating their tax arrears." *Id.* However, Plaintiffs argue that "[w]hile the offer underlying the settlement-in-principle could be accepted by any Arbitrage Management Investor, only plaintiffs who accepted the offer could be said to be in a position to calculate the extent of the injury they would sustain once the settlement was implemented." *See* Plaintiffs' Brief at 20. We disagree, and we implicitly considered this fact in the 1995 opinion. The fact that all the Plaintiffs knew of the settlement is dispositive, whether or not the Plaintiffs in question agreed to it. There is no evidence that the injuries of those who did not accept the settlement-in-principle were any different from those who accepted. Thus, we refuse to merit Defendant's previously considered argument. If we were to find otherwise, we would encourage future plaintiffs to remain ignorant of their damages when the law clearly favors their pursuit of such knowledge. *See, e.g., Klehr*, 521 U.S. at 195, 117 S.Ct. 1984 (stating that civil RICO actions should give victims an incentive to uncover unlawful activity).

Finally, we note the discussion in the Vermont Bankruptcy Court where that court considered the same question:

> This Court gives great weight to the fact that four prior federal court decisions, including this Court (Conrad, J.), analyze the notice of injury issue in great detail and in each instance conclude that the claimants had notice of their injury arising from the allegedly fraudulent scheme involving the subject Arbitrage Management partnerships, or investment partnerships, established by the debtor and his two former partners, more than four years prior to the date the subject suits were initiated. See *In re Bushnell*, 199 B.R. 843, 845–846 (Bankr.D.Vt.1996) (Conrad, J.), rev'd by 228 B.R. 811 (D.Vt.1998); *In re Bushnell*, 228 B.R. 811, 815 (D.Vt.1998), vacated by *In re Bushnell*, 270 B.R. 807 (D.Vt.2000); see also *131 Main Street Associates v. Manko*, 2001 WL 199424, at *1–2 (S.D.N.Y. Feb.28, 2001); *131 Main Street Associates v. Manko*, 897 F.Supp. 1507, 1515–1518 (S.D.N.Y.1995).

*In re Bushnell*, 271 B.R. 54, 57–58 (Bankr. D.Vt.2001) (Ex. 3 to Kesselman Aff.). We too believe that this is a settled question.

### III. Conclusion

For the foregoing reasons, the Plaintiffs' motion seeking leave to amend the amended complaint is denied.[20] Moreover, we deny Plaintiffs' motion to reconsider our 1995 finding that Plaintiffs were on notice of injury prior to February 8, 1989. Because the parties consented at oral argument on December 21, 2000 to treat a denial of the motions as the flip side of a motion for summary judgment, the motion for summary judgment is granted in favor

---

**20.** We note Defendant's arguments on the timeliness of the motion to amend and prejudice which would result were such motion granted. These arguments are rendered irrelevant by this decision.

of the Defendant. *See* December 21, 2000 Transcript, at 5–6.